CHARLES N. ATWOOD vs. THE FIRST NATIONAL BANK OF
BOSTON & another, trustees.

Suffolk.    September 18, 1974. — December 13, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Trust,* Termination, Trustee's discretion.

Where the terms of a testamentary trust gave the testatrix's husband the
  income for life and designated her son, upon her husband's death, a
  cotrustee and gave him the income for life and a testamentary power
  of appointment over the remainder, and also gave the trustees
  discretion to pay any part of the principal to any of the beneficiaries
  for any purpose deemed proper and provided that the trustees might
  pay up to one-half of the corpus to the son if they deemed it wise, it
  was improper for the Probate Court, after the husband's death, to
  order that the trust be terminated and the corpus paid to the son,
  since all the purposes of the trust had not been accomplished and it
  was within the discretion of the trustees to decline to make complete
  payment of the principal to the son. [523-524]

PETITION filed in the Probate Court for the county of
Suffolk on March 16, 1971.

The case was heard by *Sullivan,* J.

*Paul B. Sargent (Albert J. Zahka* with him) for The First
National Bank of Boston, trustee.

*Robert D. City (Robert E. Neville* with him) for the
petitioner.

WILKINS, J.    The First National Bank of Boston (the
bank), cotrustee under the will of Mabel C. Atwood (the
testatrix), appeals from a final decree of the Probate Court
for the county of Suffolk which ordered that the trust
created under the Atwood will be terminated and that the
corpus of the trust be turned over forthwith to the petition-
er, Charles N. Atwood (Charles), son of the testatrix.

The testatrix's will was probated in 1942. The will was executed in 1932, and a codicil was executed in 1941.[1] She left the residue of her estate to her husband and an attorney in trust. The will, which contained a spendthrift clause, directed that the net income of the trust be paid to the testatrix's husband during his life and, on the death of her husband, to her son Charles for his life. If he survived his mother, Charles was given a testamentary power of appointment; and in default of the exercise of that power of appointment, the trust assets were to go to Charles's issue, and in the absence of such issue, to Charles's heirs at law.[2] The residuary clause further provided that "[m]y trustees have the right in the exercise of their discretion to pay over to any of the above named beneficiaries any part of the principal to aid in the education, comfort or support of any of said beneficiaries or for any other purpose which the trustees may deem proper in the exercise of their discretion." The will provided in a separate article that "[m]y said trustees and their successors shall have the discretion if they deem it wise to set apart at any time, or from time to time, a portion of the principal of this trust not exceeding in all one-half of the trust estate for my said son Charles N. Atwood, to be transferred to him absolutely discharged from the trust."

Charles, who was born in 1909, and his father both survived the testatrix. Charles had been married in 1932,

[1] The codicil made no change in the trust provisions. It provided for pecuniary gifts to a brother and to a niece of the testatrix.

[2] The dispositive provisions of the residuary clause read as follows:

"(a) To pay the net income thereof to my husband Alton B. Atwood during his life, and upon his death

"(b) To pay the income to my son Charles N. Atwood during his life, and upon his death, I direct that the trust shall terminate and the trust estate be disposed of as he the said Charles N. Atwood may by will appoint. In default of such appointment, I direct that the share of income to which my said son would be entitled, if living, shall be paid to his issue until the youngest of said issue shall attain the age of twenty-one years, at which time the trust shall terminate and the principal be divided among said issue in equal shares free from the trust, and in the event that my said son Charles leaves no issue surviving, I direct that the principal of this trust be divided among his heirs at law.

"(c) But in the event that the said Charles N. Atwood shall not survive the said Alton B. Atwood, I direct that on the death of Alton B. Atwood the trust shall terminate and the trust estate shall be disposed of as the said Alton B. Atwood may by his last will appoint."

shortly after the will was executed. No children have been born of that marriage. In 1948, after his mother's death, medical examinations indicated that Charles was sterile. In October, 1951, Charles executed a partial release of the power of appointment given him under his mother's will. That release limited the class in whose favor he could exercise the power to his issue or spouses of his issue. The testatrix's husband died in March, 1969, in his one hundred and first year.[3]

Shortly after his father's death, Charles raised with the bank the possibility of terminating the trust. It is not necessary for the purposes of this case to summarize the evidence showing the positions taken by Charles and his counsel, on the one hand, and the bank, on the other. It is sufficient to state that the bank took the firm view that the trust should not be terminated, particularly in light of the release of the general power which Charles had executed in 1951. As a result, in January, 1970, Charles petitioned the Probate Court to declare the partial release null and void. The bank did not oppose allowance of the petition (although a guardian ad litem did), and in October, 1970, a decree was entered declaring the partial release void.[4]

Following the entry of the decree annulling the partial release, Charles pressed personally and through counsel for a distribution to him of all or a portion of the trust assets. Although the bank ultimately agreed to annual distributions of principal to permit Charles to maintain himself and his wife at the standard of living they had

[3] In 1952, pursuant to the terms of the will, the Old Colony Trust Company (now The First National Bank of Boston) succeeded the attorney as cotrustee following his death. Charles in November, 1970, was appointed cotrustee to succeed his father, as provided in the will.

[4] Charles testified that in 1951 he had not read the partial release before he signed it and that he had executed it on the request of his father. His father was then approximately eighty-three years old; Charles was then forty-two. Charles also testified that he had not told his father that he had received a medical opinion that he was sterile. The partial release was intended no doubt to exclude the value of the trust assets from Charles's gross estate for Federal estate tax purposes. Because Charles could never have issue (or a spouse of issue), the partial release was in practical effect a total release of the power. In such a circumstance, if Charles had died before the release was annulled, the trust principal would have gone to his heirs at law.

maintained before his father's death, the bank declined to make greater distributions.[5]

Charles commenced this suit in March, 1971, seeking a determination that the trustees have a right to terminate the trust, or at least that they have a right to make distribution of part of the trust assets. He sought an order for distribution of all, or at least a specified amount, of the trust assets. He also sought a determination that the bank's failure to exercise its discretion to terminate the trust and to distribute trust principal completely or partially was an abuse of discretion.

Hearings were held in the Probate Court on October 12, 1971, and January 31, 1972. A final decree was entered in October, 1972, ordering the termination of the trust.[6] The judge gave no indication of his reasons and made no findings of fact.[7] The bank, however, did not request a report of material facts. The evidence is reported. In these circumstances the decree imports a finding of all facts, open on the evidence, needed to support the decree, and the findings must stand unless plainly wrong. *Holyoke Natl. Bank* v. *Wilson,* 350 Mass. 223, 224-225 (1966). *New England Merchs. Natl. Bank* v. *Koufman,* 363 Mass. 454, 458 (1973).

Charles testified that he worked in his father's factory from 1931 until 1954, and that he had not been gainfully employed since. He also testified that his doctor had advised him not to work. His father gave him substantially more than $400,000 between 1954 and 1969, the year his father died. His living costs have been a little over $60,000 a

---

[5] Charles never presented the bank with a statement explaining what, if any, estate planning purposes he wished to achieve by having the trust assets in hand, which could not be achieved by the exercise of his power of appointment.

[6] The final decree made no determination (except perhaps by implication) that the bank had committed an abuse of discretion.

[7] The record fails to disclose why the two trial dates were separated by more than fifteen weeks or why the brief one page decree of the judge was filed more than eight months after the trial was concluded.

year. Following his father's death, Charles received cash and securities valued at over $425,000. Charles and his wife owned real estate and tangible personal property worth more than $250,000. The evidence shows that, before this suit was commenced, the bank had agreed to approve distributions of principal to an amount which would insure him of $70,000 a year from all sources. He believed that if he were to handle the investment of the trust assets (which had a market value of over $1,160,000 at the end of 1971), he could save trustee's fees and commissions averaging about $2,000 a year.

Charles argues in his brief that the issue before this court does not involve a review of a trustee's exercise of discretion. He claims rather that the final decree ordering termination of the trust is correct because the purpose of the trust has been achieved. If dissolution of the trust is now required, it is so because under the terms of the testatrix's will there is no lawful alternative to termination. We must, therefore, determine whether there remains an area within which, under the terms of the will, the trustees properly could exercise their discretion not to distribute all of the principal. This question of law turns on the testatrix's intention determined from an interpretation of the will. See *Old Colony Trust Co.* v. *Rodd,* 356 Mass. 584, 588-589 (1970), and cases cited; *Collier* v. *Napierski,* 357 Mass. 516, 519-520 (1970).

We conclude that under the testatrix's will Charles has no absolute right to a distribution of all the assets in the residuary trust. There continues to be an area of discretion within which the trustees may act concerning the distribution of principal. In such a situation, courts will not interfere with a trustee's determination not to distribute all the trust assets. See *Wright* v. *Blinn,* 225 Mass. 146, 148 (1916); *Sylvester* v. *Newton,* 321 Mass. 416, 421-422 (1947); *Boston Safe Deposit & Trust Co.* v. *Johnson,* 326 Mass. 664, 666 (1951); *Copp* v. *Worcester County Natl. Bank,* 347 Mass. 548, 551 (1964); Scott, Trusts §§ 128.7 (pp. 1033-

1034), 187 (3d ed. 1967). It is true that Charles is one of the two trustees, is the sole income beneficiary and has a general testamentary power of appointment over all of the trust assets. In addition, the will in two places expresses a broad, but not unlimited (*Woodberry* v. *Bunker,* 359 Mass. 239, 241-242 [1971]), power to pay principal to Charles. Moreover, the language of the residuary clause discloses no named testamentary object of the testatrix's affection other than her husband and her son. On the other hand, the testatrix did not provide for a termination of the trust in favor of Charles on the death of his father. She did not name him the sole trustee to exercise discretion whether to pay over principal. She did not give Charles the right during his life to appoint principal to anyone, including himself, but limited his absolute right to control the distribution of the principal to a testamentary direction. Additionally, it is significant that even the more broadly expressed discretion in the trustees or their successors to pay principal "if they deem it wise" applies only to one-half of the trust property. This limitation suggests that the testatrix intended the trust to continue throughout Charles's life. *Allen* v. *First Natl. Bank & Trust Co.* 319 Mass. 693, 696 (1946). Thus, we believe that all the purposes of the trust have not been achieved so as to compel its termination. *Ames* v. *Hall,* 313 Mass. 33, 37 (1943). *Springfield Safe Deposit & Trust Co.* v. *Stoop,* 326 Mass. 363, 365 (1950).

Although the decree ordering the termination of the trust must be reversed, we think it appropriate to indicate to the bank that reasonable requests for the distribution of principal to Charles should be given careful attention. The fact that he has other assets would not alone justify a refusal to pay over principal for a reasonable purpose. See *Lumbert* v. *Fisher,* 245 Mass. 190, 194 (1923); *Holyoke Natl. Bank* v. *Wilson,* 350 Mass. 223, 228-229 (1966); Scott, Trusts § 128.4 (3d ed. 1967). Nor, of course, would the bank's interest in its trustee's fee justify such a refusal. See *Slater* v. *Hurlbut,* 146 Mass. 308, 315 (1888); Scott, Trusts § 337, pp. 2656-2657 (3d ed. 1967). If, however, for estate

planning purposes, for example, Charles wishes to make inter vivos gifts (charitable or otherwise), the bank should give respectful attention to his requests as a beneficiary and to his views as a cotrustee. The bank must, of course, be satisfied as to the appropriateness of any proposal.

The record shows a degree of disenchantment between Charles and the bank, which may have had its origins in the now resolved disagreement concerning Charles's right to full termination of the trust. Hopefully, a new and more dispassionate analysis of the subject now can take place.

*Decree reversed.*