WALTER E. STEELE *vs.* GERALD F. KELLEY[1] & others.[2]

No. 97-P-1883.

Suffolk. August 18, 1998. - May 12, 1999.

Present: BROWN, LAURENCE, & SPINA, JJ.

*Jurisdiction,* Superior Court, Land Court. *Practice, Civil,* Judicial discretion, Instructions to jury. *Consumer Protection Act,* Availability of remedy, Trade or commerce, Unfair or deceptive act. *Judgment,* Preclusive effect. *Trust,* Termination, Trustee's discretion, Removal of trustee. *Fiduciary.*

At the trial of a civil action, the judge should have dismissed the plaintiff's G. L. c. 93A claim, where the conduct alleged in the complaint constituted a dispute between a beneficiary and a trustee over the administration of a trust and, as a matter of law, was not trade or commerce such as would bring the dispute within c. 93A; and the judge further erred by submitting that claim to the jury: a new trial was required. [726-728]

A claim in a civil action seeking an order terminating a trust was, in the circumstances, barred under principles of issue preclusion by a prior order of the Land Court. [728-730]

At a civil trial regarding the administration of a trust, the judge erred in submitting special questions to the jury, where there was no evidence presented on those issues [730-731]; in framing a special question without reference to the evidence presented [731-732]; in failing to instruct the jury to consider the intent of the trust instrument [732-733]; and in failing to instruct the jury regarding whether the purposes of the trust could be accomplished [733-734].

At the trial of a civil action regarding the administration of a trust, the judge erred in failing correctly to instruct the jury on principles applicable to a trust conferring extraordinary discretion on the trustee. [736-737]

No reasonable view of the evidence at a civil trial supported the jury's finding that a trustee acted in bad faith or fraudulently with respect to a lease of the trust property [737-740], and the judge erred in refusing, before discharging the jury, to address and resolve an inconsistency in the jury's answers to special questions on the lease [740-742].

In a civil action regarding the administration of a trust, the judge's instruc-

[1]Individually and as trustee of the Chatham's Corner Trust.

[2]The Chatham's Corner Trust, The K's Inc., Kathleen Meskell, Thomas Murphy, James Murphy, and the estates of Paul Murphy and John J. Murphy, the last five parties named only as beneficiaries of the Chatham's Corner Trust. Kelley was also a beneficiary of that trust.

tions to the jury on a special question regarding the claim for removal of the trustee were erroneous. [742-744]

CIVIL ACTION commenced in the Superior Court Department on June 15, 1994.

The case was tried before *Gordon A. Martin, Jr.*, J., sitting under statutory authority.

*Alvin S. Nathanson* for Gerald F. Kelley.

*Mark T. Collins* for The K's Inc.

*Kathleen M. Curry* for the plaintiff.

LAURENCE, J. A. *Procedural background.* On June 15, 1994, Walter E. Steele commenced the underlying suit, in his capacity as a beneficiary of the Chatham's Corner Trust (CCT), against Gerald F. Kelley, both individually and in his capacity as sole trustee of the CCT. The sole asset of the CCT was a parcel of rentable commercial real estate in downtown Boston (premises), which was registered land. Steele alleged (in an unverified amended complaint) that, as CCT trustee, Kelley had, since late 1992, refused to give the other beneficiaries an accounting, despite their demands; had mortgaged trust property to himself for $225,000 without any consideration and had also assigned trust leases and rents to himself as additional security; had leased the property for use as a restaurant and bar to The K's Inc. (K's), a corporation owned by his daughters, at less than fair market value rental; had attempted to purchase the interests of the other beneficiaries at less than fair value and told them that, unless they all sold out to him, they would not receive an accounting or any distributions; had refused the other beneficiaries' requests to terminate the CCT and distribute its assets to them; and had failed to make timely payment of real estate taxes on the trust property, resulting in tax liabilities and interest penalties.[3]

On the basis of such allegations, Steele demanded an accounting by Kelley (Count I); the voiding of Kelley's mortgage and assignment to himself (Count II); the voiding of the lease to

---

[3]The tax allegations, as well as the count for removal of the trustee (Count VI), were newly added to Steele's second amended complaint, which was submitted near the end of the trial of this suit in February, 1996, and allowed by the trial judge over Kelley's objections. While complaining of unfairness and surprise, Kelley does not assign as a separate error the judge's allowance of the second amended complaint.

the K's (Count IV); removal of Kelley as trustee (Count VI); a judgment against Kelley for violation of G. L. c. 93A, with attendant treble damages and attorney's fees (Count V); and termination of the CCT and distribution of its assets among the beneficiaries (Count III). In their answers, the defendants Kelley and the K's essentially denied all of Steele's material averments; Kelley asserted a counterclaim against Steele for abuse of process; and the K's asserted a cross claim for indemnification against Kelley in his capacity as trustee of the CCT.

Only two aspects of the parties' extensive pretrial maneuvering require mention. Kelley moved to dismiss the counts to void the mortgage and terminate the CCT on the ground that, under G. L. c. 185, § 1(*a* ½), as inserted by St. 1986, c. 463, such claims were within the exclusive jurisdiction of the Land Court because they were "[c]omplaints affecting title to registered land." A Superior Court judge denied the motion, reasoning that the court "clearly has jurisdiction over the dispute and power to award some types of relief if liability is established. . . ." Kelley later filed an unopposed motion to report the jurisdictional issue to the Appeals Court pursuant to Mass.R.Civ.P. 64, 365 Mass. 831-832 (1974). Before this motion was decided, Kelley moved to recuse all Superior Court judges from presiding over the suit because Steele was a justice of the Superior Court at the time this action was commenced.[4] Another Superior Court judge allowed the motion for recusal and transferred the case to a justice of the District Court Department. Subsequently, on April 18, 1995, the Chief Justice for Administration and Management, pursuant to his authority under G. L. c. 211B, § 9,[5] issued an order of assignment designating the District Court justice a justice of the Superior Court Department for the purposes of this suit.

Upon assuming his duties, the assigned judge denied, after hearing, Kelley's motion to report the jurisdictional issue to the Appeals Court for the same reason given by the Superior Court judge who had denied Kelley's motion to dismiss. The judge

---

[4]Steele retired from the Superior Court sometime after the conclusion of the trial.

[5]Under G. L. c. 211B, § 9(*xxi*), as appearing in St. 1992, c. 379, § 77, the Chief Justice for Administration and Management has "the power to assign a justice appointed to any department of the trial court to sit in any other department of the court, for such period or periods of time as he deems will best promote the speedy dispatch of judicial business. . . ."

also denied pending cross motions for summary judgment stating that genuine issues of material fact existed. Kelley subsequently moved for reconsideration of the denial of the motion for summary judgment as to the count to terminate the trust, which was denied on the same basis as the motions to dismiss and report to the Appeals Court.

On February 14, 1996, over Kelley's protest that the case sounded in equity and should receive a bench trial on all issues, a jury trial commenced on all of the counts of Steele's complaint as well as on Kelley's counterclaim.[6] After a two-week trial, the judge, again over Kelley's objection and motion for a directed verdict, submitted the entire case to the jury in the form of special questions pursuant to Mass.R.Civ.P. 49(a), 365 Mass. 812-813 (1974).

On March 1, 1996, the jury returned their answers to the questions as follows: (1) Kelley, as trustee, did not "properly and adequately account" to Steele for the CCT's income, but such failure caused no damage to the CCT; (2) there was "fair consideration for the granting of the $225,000 mortgage by . . . Kelley [as] trustee . . . to [himself] individually, in that there was fair value or benefit given by [him] individually and fair value or benefit received by the [CCT]" only as to Kelley's trustee's fees in the amount of $52,500 and not as to his claimed fees as attorney for the CCT, or the fees he personally paid the CCT's law firm, or the monies he personally advanced to the CCT for trust purposes; (3) the purposes of the CCT had "been frustrated so as to warrant its termination and the distribution of its assets to the beneficiaries"; (4) Kelley as trustee had "acted in bad faith or with personal and wilful misfeasance or fraud" in entering the lease with the K's so as to justify voiding the lease, and the K's "had actual knowledge that . . . Kelley acted improperly in entering into the lease," but the jury could not determine what was the proper amount of rent which the K's should have been charged and proposed letting the matter of proper rent be determined by "the average of two independent professional appraisals"; (5) Kelley as trustee had committed "an [unidentified] unfair or deceptive practice toward" Steele while engaged in trade or commerce with Steele, which had

---

[6]The cross claim of the K's was not tried at this time. With the exceptions of making suggestions as to the content of the proposed special questions to be submitted with regard to the lease and presenting a closing argument, counsel for the K's did not participate in the trial of this action.

caused Steele loss and damages in the amount of his attorneys' fees incurred in prosecuting the suit; this amount should be doubled because the act was "willful or knowing"; (6) the evidence "justifie[d] the removal of Kelley as trustee"; and (7) Steele did not commit an abuse of process by bringing the suit against Kelley.

Before the verdicts were accepted, Kelley requested that the judge harmonize the jury's answers to Count I with their answers regarding the mortgage count (arguing that if his accountings had caused no damage to the trust, neither could the challenged consideration for the mortgage, which the accountings presented to the jury had reflected). The judge effectively denied the request, declaring that no inconsistencies existed. Subsequently, the K's filed a motion for entry of judgment as to Count IV, contending that the evidence did not support the jury's finding that it had actual knowledge of any impropriety on Kelley's part, which was denied.

On April 18, 1996, the judge entered a final order of judgment in Steele's favor which (1) directed Kelley to provide an accurate and complete accounting of the CCT within thirty days; (2) declared null and void the mortgage and assignment executed by Kelley and ordered Kelley to repay the CCT all monies he had paid to himself in excess of $52,500; (3) ordered that the CCT be terminated; (4) declared null and void the lease from Kelley, as trustee, to the K's and ordered the K's to pay market rent, to be determined by and paid to a receiver; (5) removed Kelley as trustee of the CCT; (6) awarded Steele attorneys' fees and costs[7] under G. L. c. 93A, § 11, but disallowed the jury's doubling of this amount; and (7) dismissed Kelley's counterclaim for abuse of process. On the same day, the judge also issued an order appointing a receiver for the purpose of terminating the CCT and distributing its assets to the beneficiaries.

Kelley subsequently moved to alter or amend the judgment, for judgment notwithstanding the verdict as to each count (having previously moved for a directed verdict), for a new trial, and to substitute the successor trustee named under the trust instrument as a party defendant. The K's also filed its own motion to alter or amend the judgment and for a new trial. On May

---

[7]The judge allowed Steele's motion to recover his attorneys' fees from the CCT's income.

9, 1996, all the defendants' motions were denied. The defendants filed timely notices of appeal.

Kelley argues that the judgment is defective, that his directed verdict and posttrial motions attacking it were erroneously denied, and that he is entitled to reversal and a new trial for the following reasons: (1) the judge lacked subject matter jurisdiction to void the mortgage and terminate the trust because such actions affected title to registered land and were within the exclusive jurisdiction of the Land Court; (2) the judge abused his discretion in submitting to the jury, rather than trying himself, the issues in this case which, aside from the c. 93A count (as to which Steele was not entitled to a jury trial), were entirely cognizable under the principles of equity jurisdiction; (3) the judge erred in allowing the jury to consider the issue of termination of a trust in the absence of evidence supporting frustration of purpose or impossibility and on incorrect instructions; (4) the judge erred in allowing the jury to void the mortgage upon incorrect instructions; (5) the judge erred in voiding the lease in the face of insufficient evidence of breach of trust by the trustee and of the jury's conflicting responses to the special questions; (6) the court erred in submitting the c. 93A count to the jury, since the matter was not subject to c. 93A; (7) the court erred in permitting the jury to determine whether Kelley should be removed as trustee upon improper instructions; and (8) the court abused its discretion in appointing a receiver.[8]

The K's raises challenges to the lack of evidence regarding its actual knowledge of any impropriety in Kelley's leasing it the CCT premises and to the jury's allegedly inconsistent answers to the special questions regarding its lease, as well as echoing Kelley's contentions regarding subject matter and equity jurisdiction.

Although the defendants' jurisdictional arguments have surface appeal, we reject them as bases for reversal in the instant circumstances. We are persuaded, however, that the judge committed clear errors of law with respect to the remainder of the case that require reversal and a new trial.

B. *Factual background.* The tortuous factual background of this matter is well enough known to the parties as a result of the

---

[8]Kelley does not bring the dismissal of his abuse of process counterclaim before this court.

almost seventeen years of litigation in which they have been enmeshed over the CCT and its premises, to dispense with all but the most material circumstances taken from the record, for the purpose of putting the legal errors we have discerned into proper context.

The origin of the CCT was a decision by Kelley and his long-time friend, Patrick Murphy,[9] both attorneys, to go into business together by purchasing a building to be used as a restaurant and bar that would employ Patrick's brother as well as several of Kelley's children. Both Kelley and Patrick contributed funds and borrowed money for the venture. In addition, Kelley later expended his own funds and his "sweat equity" and that of family members on renovations of the premises. John Meskell (who later transferred his interest to his wife, Kathleen) was permitted to join the venture in lieu of brokerage in consideration of his location of the premises. Steele was given an interest in consideration of his personal guaranty of a portion of two loans obtained by Kelley and Patrick to purchase and then renovate the premises, but contributed no funds.

The premises that became the CCT res were initially purchased, with funds from Kelley and Patrick, in the name of a nominee trust (CWEN trust, which was controlled by Patrick and of which Steele was named trustee) with the original expectation (never, however, reduced to writing) that they would eventually be transferred outright to or in trust for the benefit of Kelley, Patrick, Meskell, and Steele, in equal shares. Instead, on February 20, 1979, a deed conveyed the premises from the CWEN trust to CCT, which was simultaneously created by a declaration of trust identifying Kelley as both the settlor and the sole trustee, Paul Murphy as successor trustee, and the beneficiaries as Kelley (twenty-five per cent), Steele (twenty-five per cent) and the CWEN nominee trust (fifty per cent). The most pertinent provisions of the trust (which was far from a model of precise draftsmanship)[10] were the following:

1. The purpose was "to deal in and with, buy, purchase, own, acquire, hold . . . lease . . . mortgage . . . land and real estate," with all necessary and lawful ancillary powers. (par. 4)

---

[9] All of the Murphys involved in this case are (or were) siblings of Patrick.

[10] The record does not make it clear exactly who drafted the trust instrument.

2. The trustee was given "absolute power, control, management, and disposition [of trust real estate] . . . and shall likewise have absolute control and management of all business of the trust." (par. 5)

3. The trustee's enumerated powers included:

   a.   selling, conveying or encumbering the trust property, "in whole or in part . . . with or without consideration," or giving it away (par. 7[A][d]); and,

   b.   doing "all the things in relation to the trust 'res' as if the trustee was the absolute owner [thereof] and this trust had never been executed." (par. 7[A][n])

4. All decisions made and exercises of power by the trustee "in good faith shall be conclusive on" the beneficiaries and "shall not require the approval of any court." (pars. 7[B], 7[C])

5. "In dealing with the trust 'res' and management thereof, the trustee shall not be held to the usual standard of care for trustees but only to the standard of care of ordinary individuals dealing with their own property and having due regard to reasonable business and speculative changes with the ultimate view of a general increase by means of frequent or otherwise turnings of conversions and his judgment shall not be subject to review." (par. 8[A])

6. "The trustee shall not be liable . . . for any act or omission in the exercise of this trust, so long as he acts in good faith . . . [and he] shall not be liable for anything except his own personal and willful misfeasance or fraud." (par. 8[B])

7. The "trustee shall be entitled to indemnify against any and all liabilities . . . which he may incur or which he may be subject, out of the trust 'res'." (par. 9)

8. "The trustee shall receive reasonable compensation for his services hereunder as determined by the trustee's discretion." (par. 10)

9. "The interest of the beneficiaries hereunder, either as to income, interest, or principal shall not be anticipated, alienated or in any other manner assigned by such beneficiaries. . . ." (par. 11)

10. The beneficiaries shall have no title or estate in any trust property and "shall have no right to call for any partition or distribution during the continuance of the trust, and the sole right, claim, and interest of the beneficiaries shall be in the obligation of the trustee to hold, manage, apply, and dispose of the trust 'res' and account for the income and proceeds thereof in the manner provided for herein." (par. 12)

11. "The trustee shall declare dividends . . . for the beneficiaries . . . if convenient . . . if the income and profits accumulated in the discretion of the trustee justify a dividend to be declared and his decision as to the amount of dividends to be declared shall be final. . . ." (par. 13)

12. "If . . . the trustee so determines in his sound discretion, he may sell the trust 'res' according to the provisions of the paragraph 7 and distribute the proceeds to the beneficiaries." (par. 14)

13. "The trustee may alter, amend or terminate this declaration of trust at any time and for any purpose . . . ." (par. 17[B])

Kelley and Patrick Murphy traveled to Steele's chambers in February, 1979, to present the trust instrument to Steele — a long-time lawyer and judge — and to obtain his signature on the schedule of beneficiaries. Steele reviewed the document, declared himself satisfied, signed the schedule, and, that same day, in his capacity as nominal trustee of the CWEN trust, signed the deed conveying the premises to the CCT. At no time thereafter, including in the course of this very litigation, did Steele (or anyone else) question the validity of the CCT or any provision of the declaration of trust or the scope of any of the trustee's powers granted thereunder.[11]

A restaurant soon opened for business on the premises that was operated by a corporation (Second State Street Corporation, or SSSC) which was owned equally by Kelley, Patrick, and Meskell, under a lease from the CCT at a rental equal to the

---

[11]No issue was ever raised below whether such unrestricted power was conferred on the trustee by the trust instrument that no trust was created as matter of law. See Restatement (Second) of Trusts § 125 (1959). Compare *Wells* v. *Doane*, 3 Gray 201 (1855); *Bacon* v. *Ransom*, 139 Mass. 117 (1885); *Daly* v. *Toohy*, 280 Mass. 51 (1932); *Smith* v. *Livermore*, 298 Mass. 223 (1937).

then monthly mortgage payment. Several of Kelley's family members were employed at the restaurant. Soon, however, increasingly bitter disagreements and dissent developed among Kelley and the Murphys, particularly Patrick, which resulted in litigation commenced in August, 1982, by several of the Murphys, claiming to be beneficiaries of the CWEN trust, against Kelley, Steele, Meskell, and the CCT[12] seeking the voiding of the 1979 conveyance of the premises to the CCT, reconveyance of the premises to the CWEN trust, and damages against Kelley individually.

The Murphys' litigation dragged on for the next decade and involved a trial that extended over two years and sixty trial days and produced a transcript of over sixty volumes. A receiver was appointed over the CCT shortly after the action commenced, and Kelley effectively played no part in its affairs for the next ten years, except to defend its title to the premises and his role as trustee. In October, 1992, a Land Court judge, sitting by designation in the Superior Court, rejected all of the Murphys' claims, upheld all of Kelley's contentions, confirmed title to the premises in the CCT and Kelley as its trustee, explicitly recognized Kelley's financial contributions to the CCT venture, and declared the beneficial interests in the CCT to be twenty per cent each in Kelley, Steele, and Kathleen Meskell and forty per cent in "the Murphy brothers and/or their legal representatives." The judge also awarded the law firm which had represented the CCT (and which also represented Kelley in the instant case) a legal fee of $161,362 for its services. The CCT receiver was discharged after a final accounting. Shortly before that discharge, the receiver had negotiated a new lease between the CCT and the SSSC for operation of the restaurant and bar on the premises calling for a monthly rental of $4,608. That lease was expressly approved by the court.

In November, 1992, however, the SSSC abruptly vacated the premises, owing the CCT approximately $40,000-$50,000 and leaving the property in substantial disrepair. Kelley exercised his newly restored authority as CCT trustee to lease the property to the K's in the spring of 1993 (claiming that he could not locate another suitable tenant despite his attempts to do so). The lease was for five years at a rental of $4,600 a month (which Kelley claimed he arrived at as a fair rental by surveying comparable establishments in the area and consulting several

---

[12]Although Patrick Murphy was named as a defendant, he in fact supported and testified for the plaintiffs in that suit.

persons experienced in commercial real estate), with a five-year renewal option at the lesser of the then market rent or $5,200 a month. The lease included a real estate tax escalation clause and required the K's to pay for all renovations and improvements (which the K's asserted amounted to approximately $150,000 in order to commence business), all of which would become the property of the CCT at lease termination.

During the period between the resumption of his active trusteeship (fall of 1992) and the commencement of the instant suit (June, 1994), Kelley undertook the acts which became the basis for Steele's complaint. Kelley determined that the CCT owed him a total of $290,000 for his past services as trustee, for attorneys' fees he had paid to the CCT's law firm and attorneys' fees for his own legal services to the CCT during the lengthy Murphy litigation, and for all unreimbursed monies he had personally advanced to the venture. One of his first acts after resuming control over the CCT was to write himself a check for $65,000 as partial reimbursement. Then, on April 4, 1993, without consulting or notifying any of the beneficiaries, Kelley, as trustee, gave himself a $225,000 mortgage on the CCT. He calculated the amount of the mortgage as consisting of the following components: (1) $38,000 to $40,000 in attorneys' fees he had personally paid the CCT's law firm; (2) approximately $38,000 in funds he had personally advanced to the venture; (3) $45,000 in attorneys' fees for his own legal services to CCT during the Murphy case (during a period when there was no trust income to pay the law firm); and (4) $105,000 in trustee's fees at the rate of $7,500 per year from 1979 to 1992. Kelley reasoned that the mortgage was the best means of protecting his interest in receiving reimbursement for these monies. As additional security against mortgage default, Kelley, as trustee, assigned to himself the leases and rents of the CCT. Kelley also determined that he was entitled to interest at eleven per cent for the monies he had advanced on behalf of the CCT.

Kelley as trustee paid himself as mortgagee $4,300 each month, sometimes doubling that amount when he felt there were sufficient funds in the CCT. In 1993, he paid himself a total of $21,064 of principal and $4,356 in interest. The next year, he paid himself $70,800 of principal and $6,500 in interest. However, Kelley failed to timely pay $13,000.66 in real estate taxes assessed on the CCT property by the city of Boston in January, 1993. As a result, the city imposed a tax lien on the

CCT and charged $871.70 in interest.[13] Kelley neglected to pay the taxes in a timely fashion because he felt that it was more important to continue mortgage payments, so as to "avoid the impression" that the CCT enterprise would be going into default, particularly in light of the threatened and pending litigation. Kelley also determined that he should receive a fee for his trustee services of $4,200 a year during this period.

Sometime after the decision in the Murphy case, an attorney purporting to represent Paul Murphy's estate and James Murphy wrote Kelley demanding an accounting of the CCT and a distribution of the alleged beneficial shares of James and Paul Murphy. Kelley's attorney responded, stating that it was unclear that the estate was a CCT beneficiary. At a subsequent meeting between the attorneys, Kelley's attorney allegedly told the Murphys' attorney that he had advised Kelley not to make any disbursements or any accounting to "any of the beneficiaries." In the spring of 1993 an attorney purporting to represent Steele wrote Kelley demanding an accounting and other information. Kelley responded by asking for proof that the attorney in fact represented Steele, because he (the attorney) had himself earlier claimed to be a CCT beneficiary by virtue of a supposed transfer of the Meskell interest to him in return for his legal services in another proceeding.

The latter demand was apparently not resolved, because a year later (April, 1994), the same attorney demanded of Kelley, on behalf of Steele, the termination of the trust and the distribution of its assets, asserting as the reason Kelley's various activities described above, which the attorney charged were "in disregard of your responsibilities as trustee," and threatening a c. 93A action. Kelley's counsel promptly responded, rejecting all imputations of illegality or impropriety. He also stated that "we are unaware of any request from any beneficiary for [an accounting]" and promised that "your client, as a beneficiary, will be furnished such an accounting within the immediate future as soon as the same can be prepared by the accountant for the trust." Kelley also wrote to Steele personally at the same time, questioning Steele's attorney's possible conflict of interest and offering to meet with Steele, at Steele's convenience, "to

---

[13]Kelley again failed to pay real estate taxes when due on the CCT's real estate for the 1995 tax year, causing the trust to pay considerable interest. Kelley eventually paid all outstanding tax liabilities and obtained release of the tax lien.

discuss any aspect of the trust," in keeping with their "long-standing practice." Steele refused to "waste [his] time" to respond to Kelley's offer. Before an accounting could be prepared, this suit was filed, two months later (June, 1994).

Thomas Murphy and John Meskell both testified at the ensuing trial that (notwithstanding the provisions of the trust, par. 11, that forbade alienation of interest by any beneficiary) in February, 1993, and April, 1993, respectively, Kelley tried to buy out Murphy's and Kathleen Meskell's beneficial interests, allegedly threatening never to sell the premises or make any distributions if they did not cooperate. Kelley denied that he had ever approached any beneficiary for this purpose, that he had any interest in purchasing the premises outright, or that he had the financial resources to do so even if he legally could.

One final procedural imbroglio is of relevance. About a month after the Land Court judge had issued his decision in the Murphy litigation rejecting the Murphys' claim to the CCT property, identifying the beneficiaries of the CCT, and establishing the percentages of their interests in that trust, the Murphys filed a motion with the judge to modify and terminate the CCT trust, which was opposed only by Kelley. The motion was quickly denied. Two days before that motion was filed,[14] Thomas Murphy had filed a petition for partition of the trust property in the Suffolk Probate Court and had recorded a memorandum and notice of petition to partition with the certificate of title in the registered land division. Kelley was not named a party to the Probate Court action but, upon discovering its existence, had filed a motion to expunge the notice in the Land Court. The Land Court allowed Kelley's motion, holding that legal title to the realty vested solely in Kelley as CCT trustee and that a beneficiary had no right to file for partition or distribution of assets under the terms and conditions of the CCT.[15] The Murphys

---

[14]Thomas Murphy filed the petition to partition on November 30, 1992. His family moved to terminate the CCT on December 2, 1992.

[15]In reaching its conclusion, the Land Court judge expressly relied on paragraph twelve of the trust instrument, which states: "No title, interest, or estate in any land, buildings or other property held by the trustee at any time hereunder is to vest in the beneficiaries and the beneficiaries shall have no right to call for any partition or distribution during the continuance of the trust, and the sole right, claim, and interest of the beneficiaries shall be in the obligation of the trustee to hold, manage, apply, and dispose of the trust 'res' and account for the income and proceeds thereof in the manner provided for herein."

did not appeal.[16]

C. *Jurisdictional issues.* Steele's complaint — which sought to strip Kelley of the title to the premises that he legally enjoyed both as trustee and mortgagee and vest such title either among the beneficiaries or in a third-party purchaser — was literally one "affecting title to registered land," which G. L. c. 185, § 1(*a* 1/2), places within the exclusive original jurisdiction of the Land Court. Kelley's contention that the judgment of the designated justice must be nullified because he was designated a Superior and not a Land Court judge is not, however, one that we deem meritorious in the present circumstances.

The Chief Justice for Administration and Management could, even now, cure the alleged defect, nunc pro tunc, under G. L. c. 211B, § 9(*xxi*). See *St. Joseph's Polish Natl. Catholic Church* v. *Lawn Care Assocs., Inc.,* 414 Mass. 1003, 1004 (1993); *Worcester* v. *Sigel,* 37 Mass. App. Ct. 764, 766-767 (1994). Cf. *Konstantopoulos* v. *Whately,* 384 Mass. 123, 129-130 (1981) (the Legislature intended G. L. c. 211B to be utilized to minimize subject matter jurisdiction concerns and to avoid dismissals on such grounds).

Equally significant is the fact that, as Kelley himself reiterates, Steele's complaint presents "matters cognizable under general principles of equity jurisprudence" (except for the c. 93A count). Such matters do not implicate any special expertise of the Land Court and therefore fall outside the rationale of the "exclusive original jurisdiction" provision. G. L. c. 185, § 1(*a* 1/2). Indeed, the more applicable category for Steele's suit appears to be under G. L. c. 185, § 1(*k*), as appearing in St. 1987, c. 421, § 1, which encompasses "[a]ll cases and matters cognizable under the general principles of equity jurisprudence where any right, title, or interest in land is involved," as to which the Superior Court and the Land Court have concurrent jurisdiction.

Kelley's contention that the judge improperly submitted the equitable counts to the jury rather than decide them himself in a bench trial is one with which we have sympathy, particularly since the resolution of Steele's charges necessarily depended upon "[t]he interpretation of a written trust [which] is a matter of law to be resolved by the court." *Schroeder* v. *Danielson,* 37

---

[16]Although the record is silent, the Murphys' probate court action presumably became moot.

Mass. App. Ct. 450, 453 (1994). Further, the decision whether to terminate a trust — the gravamen of Steele's suit — "is a judicial matter. The courts alone can make that decision." *Franklin Foundation* v. *Attorney Gen.*, 340 Mass. 197, 205 (1960).

It is, however, well established that a trial judge has wide discretion in this area. See G. L. c. 214, § 13; *Marcoux* v. *Charroux*, 329 Mass. 687, 688 (1953), and cases cited; *Hatton* v. *Meade*, 23 Mass. App. Ct. 356, 360-361 (1987). Kelley has simply failed to establish the requisite abuse of that discretion in this situation, beyond conclusorily asserting that it is almost never done and that the court was better suited than a jury to determine the facts underlying those equitable issues. See Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Compare *Parker* v. *Simpson*, 180 Mass. 334, 354-355 (1902); *Boston* v. *Santosuosso*, 307 Mass. 302, 323-324 (1940).

D. *The most palpable and outcome-determinative error.* The judge plainly and critically erred in not dismissing Steele's c. 93A count on Kelley's motion at the beginning of the proceedings (and erred again in denying Kelley's motions for a directed verdict, for judgment notwithstanding the verdict [JNOV], and for a new trial founded on the same objection to submitting the c. 93A question to the jury). The entirety of Steele's allegations constituted disputes between a beneficiary and the trustee over the administration of a trust. It is clear as matter of law that, for a violation of G. L. c. 93A, §§ 2 and 11, the acts or practices complained of must be perpetrated in a business context; that no c. 93A, § 11, claim can be maintained if no commercial relationship — i.e., that of buyer and seller of goods or services — ever existed between the parties; that internal disputes that are intra-enterprise, i.e., between parties in the same venture, do not fall within the scope of c. 93A, § 11; and that the actions of a trustee, executor, or administrator in executing fiduciary responsibilities do not constitute trade or commerce or involve the requisite commercial marketplace transactions to bring them within c. 93A. See *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22-27, cert. denied, 522 U.S. 1015 (1997); *First Enterprises, Ltd.* v. *Cooper*, 425 Mass. 344, 347-348 (1997); *Gannett* v. *Lowell*, 16 Mass. App. Ct. 325, 328 (1983); *Edinburg* v. *Cavers*, 22 Mass. App. Ct. 212, 229 (1986).

The impact of the judge's error with respect to the c. 93A count was not confined, however, to an improper resolution of

that discrete claim. It effectively tainted the whole case against Kelley, by focusing the jury's attention on the fairness or unfairness of Kelley's alleged acts of misconduct as trustee rather than on measuring Kelley's discretionary acts as trustee vis-à-vis Steele (and the other beneficiaries testifying in his behalf) against the appropriate standard of duty and performance under this particular trust instrument, in light of the settlor's expressed intentions, the scope of the trustee's powers, and the circumstances attending the creation of the trust, as well as under generally applicable trust principles. See, e.g., *Dumaine* v. *Dumaine*, 301 Mass. 214, 216-223 (1938); *Berry* v. *Kyes*, 304 Mass. 56, 59-60 (1939); *Price* v. *Price*, 341 Mass. 390, 392-393 (1960); *Atwood* v. *First Natl. Bank,* 366 Mass. 519, 523-524 (1974); *Symmons* v. *O'Keefe*, 419 Mass. 288, 298 n.9 (1995); *Shear* v. *Gabovich*, 43 Mass. App. Ct. 650, 674-675, 682-683 (1997); Restatement (Second) of Trusts §§ 164, 187, 201 & 222 (1959). See also discussion *infra* at 731-739.

The taint of this fundamental error over the entire proceeding was spread by Steele's attorney, in her closing, when she told the jury they were "to look at each claim that we have made [each of which represented a claim of Kelley's breach of trust] under the unfair and deceptive practices act . . . and say if the acts of Kelley constitute unfair and deceptive practices to the detriment of these beneficiaries." The decisive contamination was, however, more indelibly impressed on the entire course of jury deliberations by the judge's charge regarding the c. 93A issue. He told the jury, without any reference to the trust instrument or to Kelley's extensive powers set forth therein, that they should "[f]ocus on what was complained of in this action" in determining whether Kelley's dealings with Steele were unfair, to determine whether each complained of "act or practice fall[s] within some concept of unfairness . . . whether [Kelley's] act or practice was immoral as you perceive it, unethical as you perceive it, or unscrupulous, [or] otherwise unconscionable, as you view those terms . . . [as to each of] the acts that have been testified to ⁒ . . ."

The judge then compounded the prejudice of his initial error, first, by instructing the jury to consider the c. 93A claim with specific reference to the letter from Steele's attorney to Kelley in the spring of 1994 which explicitly charged that each of Steele's claims of Kelley's trustee misconduct vis-à-vis the beneficiaries constituted unfair or deceptive practices violative

of c. 93A; and second, by improperly framing the special question on c. 93A without requiring the jury to specify what conduct on Kelley's part they found unfair or deceptive. The jury were thereby invited to determine that acts of Kelley as trustee which were expressly authorized (or exculpated) by the CCT declaration of trust, or were arguably within his wide discretion, or were otherwise permissible under general trust principles, could be the basis for imposing liability on Kelley in favor of Steele.[17]

The judge's legal error in connection with the c. 93A count justifies reversal of the entire judgment against Kelley and the allowance of a new trial because we are persuaded that the verdicts reflected a fundamental misunderstanding of applicable law flowing from the improper inclusion of c. 93A considerations in the jury's evaluation of the legality of Kelley's challenged acts as trustee and their incorrect instructions thereon, with the result being, in our view of the whole case, a miscarriage of justice. See *Hall* v. *Giusti Baking Co.*, 322 Mass. 317, 318-320 (1948); *Pfeiffer* v. *Salas*, 360 Mass. 93, 100-101 (1971); *Galvin* v. *Welsh Mfg. Co.*, 382 Mass. 340, 343-345 (1981); *Graci* v. *Damon*, 6 Mass. App. Ct. 160, 167, *S.C.*, 376 Mass. 931 (1978); *Evans* v. *Multicon Constr. Corp.*, 6 Mass. App. Ct. 291, 295 (1978); *O'Leary* v. *Jacob Miller Co.*, 19 Mass. App. Ct. 947, 948 (1985); *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 748 (1993).

In short, by denying the motion for new trial, the trial judge clearly abused his discretion because there was a patent and crucial error of law that, we have no doubt, substantially prejudiced Kelley's rights in the proceeding. Mass.R.Civ.P. 61, 365 Mass. 829 (1974). See 11 Wright, Miller & Kane, Federal Practice and Procedure § 2805, at 55 (2d ed. 1995) ("Any error of law, if prejudicial, is a good ground for a new trial"). The consequences of the error regarding the c. 93A count manifestly require reversal of the finding of Kelley's violation of the statute and of the award to Steele of attorneys' fees and costs.[18]

E. We proceed to discuss additional clear errors of law which

---

[17]Special questions must always be viewed in light of the accompanying instructions given by the judge. *Draghetti* v. *Chmieleswki*, 416 Mass. 808, 818 (1994). Defective questions are not salvaged by defective instructions.

[18]The attorneys' fee award was improper in any event, the jury having failed to identify any proximately caused actual loss of money or property by Steele from the unidentified c. 93A violations. See *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 718 (1989); *Levy* v. *Bendetson,*

we have identified as justifying reversal, for guidance in the event of a new trial.

1. *Trust termination (Count III).* The submission to the jury of the special question regarding Count III (seeking an order terminating the trust) over Kelley's objection and directed verdict motion was erroneous for several reasons.[19]

a. *Issue preclusion.* As noted above (at 724-725), the Murphys, in late 1992, persisted in their unremitting efforts to wrest the premises from Kelley and the CCT, notwithstanding the Land Court's October, 1992, judgment rejecting their claims and confirming Kelley's title to the premises as CCT trustee, by moving in the Land Court to modify the judgment and terminate the trust (which was denied); and by petitioning for partition of the trust property (with notice to Steele and the other beneficiaries). These attempted end-runs by the Murphys were defeated (on Kelley's motion to the Land Court) by the Land Court judge's determination that "a beneficiary [of the CCT] has no right [under the terms and conditions of the trust] to file for a partition." No CCT beneficiary appealed that determination.

Steele's termination claim — in functional effect, another petition for ending the trust by partition and distribution of the trust property, since Steele neither alleged nor introduced evidence suggesting impossibility or frustration of the trust's purposes (see *infra* at 732-734) — is, accordingly, barred under principles of issue preclusion by virtue of the Land Court judge's order. Steele testified that the only way for Kelley to terminate the CCT under the terms of the trust was by selling the trust property and admitted that he seeks to accomplish this goal through a partitioning of the real estate, with the sales proceeds distributed to the beneficiaries. He had no standing to pursue this claim, however, because of the Land Court judge's previously unappealed ruling that the CCT beneficiaries have no right to seek a partition. Although Steele was not a formal party to those proceedings, the Land Court judge's order applies to him because "[a] person who is not a party to an action but

6 Mass. App. Ct. 558, 566-567 (1978); *Martha's Vineyard Auto Village, Inc.* v. *Newman,* 30 Mass. App. Ct. 363, 369-370 (1991).

[19]Aside from the inadvisability of abdicating responsibility for such a serious and outcome-determinative issue to a jury, "The decision [to terminate a trust depends upon] whether the purposes of the trust have been achieved[. It] is a judicial matter. The courts alone can make that decision." *Franklin Foundation* v. *Attorney Gen.,* 340 Mass. at 205.

who is represented by a party is bound by . . . a judgment as though he were a party." Restatement (Second) of Judgments § 41(1) (1982). By appearing in the Land Court action as trustee, Kelley represented Steele's beneficial interests for issue preclusion purposes. See *Roche* v. *Roche*, 22 Mass. App. Ct. 306, 309 (1986); Restatement (Second) of Judgments § 41(1)(a) (1982).

b. *Error in submitting the special question concerning trust termination.* Kelley's several objections to the submission of a special question regarding trust termination, included in his directed verdict and posttrial motions as to Count III of the amended complaint, were well taken. Steele failed to plead or prove either frustration or impossibility with respect to the CCT. Even under the rigorous standard applied to directed verdict and JNOV motions,[20] the record is devoid of any evidence supporting a finding that the trust's purposes had been frustrated by subsequent circumstances or had been rendered wholly impossible. The evidence was clear (as had been found by the Land Court judge in the *Murphy* v. *Kelley* litigation) that the premises had been originally purchased for use as a restaurant and bar operated by or employing, among others, several members of Kelley's family, with the res of the trust (the whole purpose of which was stated to be, inter alia, "to deal in and with . . . real estate") consisting of the premises and the principal trust activity the leasing of the premises to another corporation which would operate the restaurant and bar.

No claim was ever made by Steele (or any other beneficiary) that any of the trust's stated or intended purposes had been literally frustrated or could no longer be accomplished, nor was a scintilla of evidence introduced that would rationally support such a claim even had it occurred to Kelley's adversaries in pressing their incessant demands to obtain a distribution of the

---

[20]The evidence (including all reasonable inferences therefrom) must be taken in the light most favorable to the plaintiff, and only when no rational view of the record would warrant a finding for the plaintiff may the issue be taken from the jury. See *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972); *Campbell* v. *Thornton*, 368 Mass. 528, 535 (1975). We note, however, that with respect to Kelley's self-same objections in connection with his new trial motion as to Count III, the standard is different: the plaintiff's evidence need not be automatically accepted, rational inferences need not be resolved in his favor, and, even if sufficient evidence was presented to surmount directed verdict and JNOV motions, a new trial may nevertheless be granted if the verdict is greatly against the weight of the evidence. See Smith & Zobel, Rules Practice § 59.3 (1977); 11 Wright, Miller & Kane, Federal Practice and Procedure § 2806, and authorities cited therein.

trust's assets. The record simply did not, as it "must[,] contain [any] facts from which reasonable inferences based on probabilities rather than possibilities . . . [could] be drawn" establishing frustration in or impossibility of effecting trust purposes by any evidence, much less "evidence [that was] sufficiently concrete to remove any inference which the jury might draw from it from the realm of mere speculation and conjecture." *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976).

c. *Error in framing the special question concerning trust termination.* Kelley persistently urged the judge to frame all the special questions with explicit reference to the exceptionally extensive discretionary powers he was accorded as trustee under the CCT declaration of trust (see *supra* at 718-720). The judge refused to do so except with reference to the questions relating to Count IV, the lease to the K's. This was legal error.

The issue of termination, like any other matter relating to rights created by a trust instrument, including the extent of a trustee's discretion, initially is a question of law that turns on the settlor's intention as reflected in the words of the instrument. See *Berry* v. *Kyes*, 304 Mass. 56, 59 (1939); *Collier* v. *Napierski*, 357 Mass. 516, 519-520 (1970); *Atwood* v. *First Natl. Bank*, 366 Mass. 519, 523-524 (1974); *Harrison* v. *Marcus*, 396 Mass. 424, 429 (1985); 4 Scott, Trusts §§ 329A, 334.1 & 335 (Fratcher 4th ed. 1989). Under the terms of the CCT, only the trustee was given the discretionary power to decide whether to terminate the trust. Steele not only failed to plead that Kelley had abused his broad discretion in not terminating the trust; he failed to produce any such evidence. His entire case was directed at trying to establish Kelley's alleged wrongs in administering the trust. (Kelley, on the other hand, introduced evidence that changing, adverse market trends and conditions militated against sale of the trust premises when and as demanded by Steele and his allied beneficiaries.) Cf. Restatement (Second) of Trusts § 337 comment n (1959) ("Where by the terms of the trust discretion is conferred upon the trustee whether or not to terminate the trust, the beneficiaries cannot compel termination, since this would be contrary to the intention of the settlor").

Since the judge was obligated to submit a material issue to the jury on special question when requested by a party, and since the issue of the trustee's discretion was manifestly material to the issue of termination of the trust, the judge committed

reversible error by effectively removing such a critical factual issue entirely from the jury's purview when he failed to include the trustee's extraordinary scope of discretion as conferred by the declaration of trust as an element of the special question on trust termination. See *Stone* v. *Orth Chevrolet Co.*, 284 Mass. 525, 528-530 (1933); *Damon* v. *Damon*, 312 Mass. 268, 271 (1942); 4 Scott, Trusts § 334.1; Smith & Zobel, Rules Practice § 49.5 (1977).

d. *Error in instructions.* The judge was obligated to provide the jury with correct instructions as to the principles of law governing the factual issues committed to jury determination by special questions in order to guide and control their action — whether or not the parties requested them. See *Alfonso* v. *Lowney*, 11 Mass. App. Ct. 338, 340 (1981); *Fenton* v. *Bryan*, 33 Mass. App. Ct. 688, 693 (1992); Smith & Zobel, Rules Practice § 51.3. The instructions provided on Count III were not "in substantial compliance" with that standard. *Narkin* v. *Springfield*, 5 Mass. App. Ct. 489, 491-492 (1977).

Not only did the instructions fail to mention the trustee's distinctive discretion under the trust, thereby exacerbating the critical omission in the special question, see *supra* at 731-732; more fatally, the charge inadequately informed the jury with respect to the first and most significant factual issue they would have to address under the doctrine of frustration or impossibility: What were the "original purposes" of the trust, which in turn depended on what the intent of the trust instrument was, for that intention "is the 'controlling consideration' in determining the rights" of the parties under the trust. *Dumaine* v. *Dumaine*, 301 Mass. at 218, quoting from *Gray* v. *Hemenway*, 268 Mass. 515, 518 (1929). The judge's instructions left the jury with no guidance whatsoever in making that determination. They were simply told to "find" whether "the original purposes . . . can no longer be fulfilled."

Although the judge generally admonished the jury to "read and consider most carefully" the trust document prior to his specific instructions on the special questions, he failed to refer to it at the very time the document's language became particularly vital, in connection with Count III. "It is fundamental that a trust instrument must be construed to give effect to the intention of the donor as ascertained from the language of the whole instrument considered in the light of circumstances known to the donor at the time of its execution." *Groden* v.

*Kelley*, 382 Mass. 333, 335 (1981). In making the determination, the fact finder must consider the "whole instrument . . . due weight being given to all its language, with some meaning being given, if possible, to all parts, expressions, and words used, discarding and disregarding no parts as meaningless, if any meaning can be given them consistently with the rest of the instrument. Effect is to be given to the intent so ascertained." *Dumaine* v. *Dumaine*, 301 Mass. at 218 (citations omitted).

Without such pointed direction to the jury to concentrate on the fundamental data represented by the language of the entire trust document — especially the provisions relating to the extent of the trustee's discretion as to the very issue at hand, termination of the trust — and the attendant circumstances that had given rise to the CCT (see *supra* at 718), the jury were left rudderless regarding the original intended purposes of the trust. They may well, therefore, have concluded — for such was the entire thrust of Steele's case — that satisfying the desires of the beneficiaries for distributions from the trust was its very purpose, which had been unreasonably frustrated by Kelley's apparently arbitrary (when viewed without consideration of his substantial discretion under the instrument) decisions not to do so, at least at the times of the beneficiaries' requests therefor. Such a conclusion was not, however, justified by either the terms of the trust, the circumstances of its creation, or the objective fact that its original functional purposes (owning and leasing realty) were in no way impaired or frustrated but rather fully capable of continued realization (see *supra* at 730-731).

A final defect in the Count III instruction was its failure explicitly to alert the jury to the fact that, if *any* material purpose of the trust could still be accomplished, "the beneficiaries cannot compel its termination." *Franklin Foundation* v. *Attorney Gen.*, 340 Mass. at 205. Restatement (Second) of Trusts § 337(2). See *id.* at § 335 comment a.[21] In other words, the jury should have been alerted, as Kelley had requested, that the

---

[21]Indeed, the trustee has an affirmative obligation to resist the efforts of beneficiaries or others who seek to end the trust whenever there is reasonable ground for such resistance, including the continued feasibility of achieving any of the trust's intended purposes. See Bogert, Trusts and Trustees §§ 581, 998 (2d ed. 1980 & 1983). "[T]he court will not interfere if the trustee [to whom the trust instrument gave broad discretion] is not guilty of an abuse of discretion in refusing to terminate the trust." 4 Scott, Trusts § 334.1, at 419. See *Damon* v. *Damon*, 312 Mass. at 271-272.

doctrine of frustration is inapplicable unless *all* of the objectives for which the trust was created "have been utterly defeated by circumstances arising after [its] formation." *Selig* v. *Wexler*, 355 Mass. 671, 680 (1969).[22,23]

2. *Voiding the mortgage.* Were Kelley as trustee of the CCT subject solely to traditional equitable principles, he would have much for which to answer by having mortgaged the trust premises to himself, even if his evidence had sufficiently established that the amount of the mortgage reflected actual reimbursements he was due by virtue of the purported payments he had made or services he had rendered on behalf of the CCT (an issue we do and need not decide on this appeal). That is because of the fundamental fiduciary doctrine long established in equity that the trustee's duty of loyalty to administer the trust solely in accordance with its terms and in the interest of the beneficiaries presumptively precludes (in the absence of court approval) any sale of trust property or any interest therein to the trustee individually, or the loan of personal funds to the trust at interest, or the purchase of any encumbrance on the trust property for himself, however fair the consideration. See *Morse* v. *Hill*, 136 Mass. 60, 62-64 (1883); *Hayes* v. *Hall*, 188 Mass. 510, 511-514 (1905); *Comstock* v. *Bowles*, 295 Mass. 250, 257-259 (1936); *Jose* v. *Lymans*, 316 Mass. 271, 278-280 (1944); *Horwitz* v. *Horwitz*, 3 Mass. App. Ct. 753, 754 (1975); *Johnson* v. *Witkowski*, 30 Mass. App. Ct. 697, 705-706 (1991); Restatement (Second) of Trusts § 170 & comments b & j; 2A Scott, Trusts §§ 170 & 170.25 (Fratcher 4th ed. 1987); Bogert, Trusts and Trustees §§ 543, 543(A) & 543(D) (2d ed. 1993).

It has, however, also been long recognized that the terms of the trust document may grant the trustee such extensive discretion, beyond that ordinarily inhering in a trustee as matter of law, as to authorize the performance of acts which would otherwise be invalid as violative of the trustee's normal duties. See *Hall* v. *Bliss*, 118 Mass. 554, 558-561 (1875); *Dumaine* v. *Dumaine*, 301 Mass. at 218-233; Restatement (Second) of Trusts

---

[22]We note that G. L. c. 203, § 25, authorizes judicial termination of a trust and distributions of the trust property upon petition of the beneficiaries, but only upon certain factual findings *by the court*, none of which were made in the instant case.

[23]Since the verdict with respect to termination of the trust was infected with error for the reasons discussed above, the April 18, 1996, order appointing a receiver to attend to the termination and distribution of trust assets to the beneficiaries was also erroneous and must be reversed.

§ 170 comment t; 2A Scott, Trusts § 174; 3 Scott, Trusts § 187.2 (Fratcher 4th ed. 1988); Bogert, Trusts and Trustees § 543(U). In such a case, acts of a trustee challenged as improper self-dealing will be struck down by the courts only "upon clear proof that the trustees are abusing their authority and acting in perversion of the trust," *Dumaine* v. *Dumaine*, 301 Mass. at 221. *Leverett* v. *Barnwell*, 214 Mass. 105, 108 (1913). In other words, courts will interfere with the conduct of a trustee with extraordinary discretion only "on those relatively rare occasions when it is necessary to prevent an abuse of [that] discretion," *State St. Bank & Trust Co.* v. *Reiser*, 7 Mass. App. Ct. 633, 635 (1979). See Restatement (Second) of Trusts § 187, which requires proof that the trustee "act[ed] beyond the bounds of a reasonable judgment," i.e., "arbitrarily, capriciously, or in bad faith," *Boston Safe Deposit & Trust Co.* v. *Stone*, 348 Mass. 345, 351 (1965); or "dishonestly, arbitrarily, in bad faith, or as the result of fraud." *Price* v. *Price*, 341 Mass. 390, 392-393 (1960). See *Wright* v. *Blinn*, 225 Mass. 146, 148 (1916); *Sylvester* v. *Newton*, 321 Mass. 416, 421-422 (1947); Restatement (Second) of Trusts § 187 comments e-j.

Examination of the CCT trust instrument plainly reveals that it conferred upon the trustee such an amplitude of discretionary power — "absolute power, control, [and] management" of the trust res and all trust business (par. 5) and the right to deal with the trust property as if he were the "absolute owner [thereof]" (par. 7[A][n]), measured by a standard of conduct that not only allowed speculative decisions not permitted ordinary, prudent trustees (par. 8[A]) but also made trustee decisions "conclusive" (par. 7[B], [C]) and "not . . . subject to review" (par. 8[A]), and free from any personal liability for any act as trustee so long as it was done "in good faith" (pars. 7[B], 8[B]) and without "personal and willful misfeasance or fraud" (par. 8[B]), with concomitant "absolute" discretion whether or not to sell or mortgage the trust property "in whole or in part . . . with or without consideration" (par. 7[A][d]), to distribute income or principal to the beneficiaries (pars. 13 & 14) or to terminate the trust (par. 17[B]) — as to be far in excess of "mere discretion." *Dumaine* v. *Dumaine*, 301 Mass. at 219. Indeed, the broad spectrum of powers accorded by the CCT declaration appears to come close to the trust, envisioned as permissible by the Supreme Judicial Court, "which by its terms [makes] the judg-

ment of the trustee, however unwise it might be, the final test."
*Corkery* v. *Dorsey*, 223 Mass. 97, 101 (1916). *Dumaine* v. *Dumaine*, 301 Mass. at 222.

We need not decide whether such uncontrollable discretion
should ever be countenanced. At the very least, however, acts
performed pursuant to such sweeping discretionary powers as
were conferred on the CCT trustee should be subject to the test
set forth above: were they so arbitrary, capricious, dishonest, or
fraudulent as to amount to an abuse of discretion that should be
prevented or corrected by a court of equity? Kelley sought in
vain to have the court frame the special question regarding
Count II (requesting the voiding of the CCT mortgage to Kelley
individually) and the instructions thereon in light of the special
nature of the CCT and the particularly enhanced quality of his
discretion as CCT trustee. Even had Kelley not requested them,
the judge was obligated to provide the jury with legally accurate questions and instructions thereon.

The special questions on Count II failed to reflect the
principles discussed above applicable to a trust conferring
extraordinary discretion on the trustee. They consisted entirely
of directions to the jury to consider whether each component of
the amounts that Kelley claimed to be owed out of the CCT on
behalf of his past disbursements and services represented "fair
consideration" (a technical legal term undefined and not illustrated by the court) for the mortgage. At most, the issue as
presented was but one of many relevant circumstances which
the fact finder would have to consider in determining whether
the trustee's conduct constituted an abuse of discretion, see
Restatement (Second) of Trusts § 187 comment d, and entirely
omitted the key concept of abuse of discretion, in the form of
arbitrary, capricious, or bad faith conduct, with respect to each
category of challenged trustee action under Count II.

Nor did the judge's instructions on the Count II questions
remedy these omissions. Although the judge, prior to instructing
on the special questions, did state that the CCT trustee "is
given broad discretionary powers" and that the jury "may
consider the extent of th[at] discretion," he did not identify or
specify those powers, mentioned above (as Kelley had
requested), which were most pertinent in evaluating the
mortgage transaction; and his observation that any exercise of
discretion by the trustee had to be "in good faith" (a concept he

again did not define or illustrate) fell far short of setting forth the additional factors to be considered when weighing the validity of highly discretionary trustee performance under the abuse of discretion standard. The specific charge on Count II itself again inadequately advised the jury to focus on the "fairness" and "reasonableness" of the actual dollar figures Kelley claimed he was owed by the CCT, rather than on whether his exercise of discretion in deciding to reimburse himself for those items and in determining their amounts was so irrational or dishonest as to amount to an abuse of discretion — a flaw whose prejudicial impact was intensified by the erroneous inclusion of c. 93A considerations in the jury's deliberations (see *supra* at 726-728).

The judge's questions and instructions on Count II were additionally and similarly flawed by their omission of any reference to the "exculpatory clause" of the trust (see *supra* at 718-720) or to the standards for its application, namely proof of bad faith and "personal and wilful misfeasance or fraud."[24] In the absence of any instructions or findings with respect to the applicability of that clause, the provision of the judge's final order dated April 18, 1996, that imposed surcharges on Kelley for various amounts reflecting alleged mortgage components cannot stand.

3. *Voiding the lease.* The judge's primary special question on Count IV (seeking to void Kelley's lease to the K's) — framed so as to focus the jury (at least generally) on "the powers and authority given to the [t]rustee under the terms of the" CCT and on whether Kelley had "acted in bad faith or with personal and wilful misfeasance or fraud" in the lease transaction — essentially avoided the defects of the Count II mortgage questions, as did his brief instructions thereon. However, the judgment on the answers to that special question, terminating the K's lease and ordering the receiver to enter a new lease with the K's at "market rent," cannot stand, because the jury's implicit finding of bad faith or fraud on Kelley's part and of "actual knowledge" of impropriety by Kelley on the K's part

---

[24]Such provisions are effective and not against public policy. See *Boston Safe Deposit & Trust Co.* v. *Boone*, 21 Mass. App. Ct. 637, 644 (1986). When such clauses are utilized in a trust instrument granting the trustee broad powers, they essentially exempt the trustee from liability for everything except "intentionally making away with [i.e., stealing] the trust property" and "reckless indifference to [the] true interests of the trust." *Warren* v. *Pazolt*, 203 Mass. 328, 347 (1909). See *Anderson* v. *Bean*, 272 Mass. 432, 446-447 (1930).

are not supported by the record.[25]

The entirety of the evidence against Kelley on this issue consisted of (1) the fact that the K's was a corporation owned by his daughters; (2) Steele's testimony that at some unspecified time during the Murphy litigation (possibly as long as a decade before the lease transaction) Kelley had once told him that the monthly rental for the premises should have been $6,000.00 (a conversation Kelley denied); and (3) Steele's "suspicion" that Kelley's spring 1993 lease to the K's had been "a sweetheart deal" — a suspicion which Steele conceded was supported by no facts but only his belief that the K's was actually run by and for Kelley personally. Steele presented no evidence whatsoever as to fair market rentals of similarly situated properties as of the spring of 1993 and admitted that he had consulted no one with experience in the matter prior to alleging that the rental was below market. Steele also introduced no evidence that the K's was a sham or straw corporation or otherwise had acted merely as Kelley's agent in operating the restaurant and bar on the premises.

Arrayed against this dearth of proof on Steele's part was uncontested evidence that the court in the Murphy litigation had expressly approved the tenancy immediately (less than a year) before that of the K's at a rental of $4,600.00 — a transaction to which neither Steele nor any other beneficiary ever registered any objection — with renovations paid for by the CCT (whereas the K's lease obligated the lessee to pay for the renovations and leave them for CCT's benefit upon lease termination); that Kelley (whom the trust document gave sole discretion to lease the property upon such terms as he deemed appropriate) had consulted with several persons experienced in commercial real estate, including real estate agents and lawyers, and had personally evaluated the "rental situations" in the general area, which (including Quincy Market) was then "depressed" compared to the market conditions of the 1980's (a comparision which Steele

---

[25]Steele had in fact never pleaded or alleged fraud or bad faith as to any of Kelley's challenged actions in the several versions of his complaint. Compare Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974). Had those matters not been made relevant by the standards of performance for a trustee with expanded discretion (as discussed in section 2, *supra*), Steele would have been precluded from raising the issue. See *Aerostatic Engr. Corp.* v. *Szczawinski*, 1 Mass. App. Ct. 141, 143 (1973).

acknowledged at trial was accurate); that the K's officers had checked with establishments in "the same vicinity" and discovered that their lease rental figure was comparable to what others were paying; and that it had been clearly understood by all concerned (including Steele) from the inception of the enterprise that members of the Kelley family were to be involved in and benefit from operating the restaurant and bar on the premises.

On this state of the record, the jury could not validly find fraud or bad faith (which is in the nature of fraud, *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 416 [1937]) on Kelley's part except by speculation.[26] Such matters are never presumed but must be affirmatively proved. *Barron* v. *International Trust Co.*, 184 Mass. 440, 443 (1903). *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 416-417. *Kerrigan* v. *Fortunato*, 304 Mass. 617, 620 (1939). *Cohen* v. *Santoianni*, 330 Mass. 187, 192 (1953). Similarly, the jury's answer was inconsistent with the fundamental principle that the corporate identity and form are not to be disregarded except on specific proof of fraudulent or dishonest circumstances justifying the piercing of the corporate veil, none of which circumstances were here presented, much less established, by Steele's evidence, beyond admittedly subjective surmise. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618-621 (1968); *Gordon Chem. Co.* v. *Aetna Cas. & Sur. Co.*, 358 Mass. 632, 637-639 (1971).

The fact that familial relationships on both sides of the transaction were involved does not in itself (which is all Steele's evidence amounted to) give rise to a supportable inference of impropriety, let alone fraud. See *Kerrigan* v. *Fortunato*, 304

[26]Indeed, the judge himself underscored the speculative nature of the jury's conclusion in a posttrial proceeding on the receiver's report, by observing that the jury's inability to find what "proper rent" should have been apparently resulted from their "operating in . . . an inadequate vacuum . . . [but they] smelled a rat and believed that the arrangements were inequitable." Ironically, the judge heard the receiver testify at that proceeding that the fair market rental figure he had obtained from an independent appraiser was ten per cent *less* than the rent Kelley had charged the K's, but neither that discrepancy nor the judge's recognitions of the jury's conjecture fueled by mere suspicion persuaded the judge to reconsider his judgment, despite Kelley's urgings. Moreover, it is clear that the jury failed to accept Steele's testimony as to the purported statement by Kelley that the fair lease value was $6,000 a month, because (as discussed *infra*) the jury stated that it was unable to determine what was the fair market rent that should have been obtained on behalf of the CCT.

Mass. at 620; *Cohen* v. *Santoianini*, 330 Mass. at 192-193. Cf. *Oberlin College* v. *Fowler*, 10 Allen 545, 547 (1865); *Anderson* v. *Bean*, 272 Mass. 432, 444-447 (1930); *Vinal* v. *Gove*, 275 Mass. 235, 241-242 (1931); *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 416-417.

The jury verdict approving the voiding of Kelley's lease to the K's was, consequently, unsupported by any reasonable view of the evidence, as well as so manifestly against the weight of the evidence (at least in conjunction with the jury's improper consideration of the fairness of the transaction under the c. 93A count erroneously submitted to them) as to make it clear, to a substantial certainty, that they misunderstood the applicable law and failed to come to a reasonable conclusion on the state of the evidence before them. Accordingly, notwithstanding the considerable deference normally shown the trial judge in such matters, here we discern an abuse of discretion in the denials of Kelley's JNOV motion or (at the very least) his new trial motion. See the authorities cited *supra* at 728-732 and at 730 n.20; *Alholm* v. *Wareham*, 371 Mass. at 627-628; *Forlano* v. *Hughes*, 393 Mass. 502, 507-508 (1984); *Precourt* v. *Frederick*, 395 Mass. 689, 694-697 (1985); *Corsetti* v. *Stone Co.*, 396 Mass. 1, 23-25 (1985); *Young* v. *Atlantic Richfield Co.*, 400 Mass. 837, 841-843 (1987), cert. denied, 484 U.S. 1066 (1988); *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989); *Bavuso* v. *Caterpillar Industrial, Inc.*, 408 Mass. 694, 699-702 (1990); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706 n.3 (1990); *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 438, 440-442 (1992); *Anthony H.* v. *John G.*, 415 Mass. 196, 199-201 (1993); *Urti* v. *Transport Commercial Corp.*, 479 F.2d 766, 768-770 (5th Cir. 1973); *Kearns* v. *Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988).

A further reason to reverse the judgment regarding the lease and afford a new trial on the issue is the judge's refusal to address and resolve a palpable inconsistency (forcefully brought to the judge's attention by the defendants) in the jury's answers to the special questions on the lease. Though finding that the lease was improperly entered into by Kelley, the jury were unable to answer the question what was "the proper rent" Kelley should have charged the K's. It defies reason and logic that the jury could conclude that the lease was so tainted as to deserve to be voided yet be unable to state what the fair rental should have been, or even whether it was other than that agreed to by the parties.

It was Steele's burden to demonstrate that the lease transaction had caused injury to the trust, a burden he failed to carry because of the failure of his evidence on the rental issue. On the record presented to the jury — as their answer revealed and as the judge himself conceded[27] — any damage verdict would be so impermissibly based on speculation as to lack a rational foundation. See *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 24 (1997), and cases cited. If no damage resulted to the CCT from the K's lease, whatever Kelley's purported motives or misconduct may have been, there was no basis for terminating that lease.[28] See *Cohen* v. *United States Trust Sec. Corp.*, 311 Mass. 152, 161-162 (1942) (where there is no proof "that the trust had been injured, or that the [beneficiaries] . . . have been harmed [by a challenged transaction], there is no occasion for equity to interpose"); *Edinburg* v. *Cavers*, 22 Mass. App. Ct. at 220-224. The judge's refusal to seek harmonization of the inconsistent answers before discharging the jury is, therefore, an independent ground for ordering a new trial. See *Feaver* v. *Railway Exp. Agency, Inc.*, 324 Mass. 165, 168-169 (1949); *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799-802 (1987); *Hopping* v. *Whirlaway, Inc.*, 37 Mass. App. Ct. 121, 125-126 (1994).

Finally, the jury's positive answer to the second special question on Count IV, whether Steele had proven that the K's had "actual knowledge" that Kelley had acted improperly in entering into the lease, was clearly wrong and should have been rejected by the judge on either the defendants' motions for JNOV or for a new trial. Not only was the jury's inability to determine what was a proper rent subversive of the conclusion that there was anything improper on the part of the K's in entering the lease, but, more fundamentally, the record was absolutely barren of any evidence — except for the relationship of Kelley

[27]In denying Kelley's request to have the jury harmonize their answers as to the lease, the judge stated that the jury were simply "saying [that] there was something wrong with this lease but there was inadequate evidence as to [its rental] value." To the extent the jury thought "something [was] wrong" because of the relationship of the parties, their conclusion would be clearly wrong, since the mere fact of that relationship does not, as discussed above, permit an inference of bad faith or impropriety.

[28]The issue is analogous to the question of lost profits damages, which must be proved with reasonable certainty and may not be recovered where they are "uncertain, contingent, or speculative." *John Hetherington & Sons, Ltd.* v. *William Firth Co.*, 210 Mass. 8, 21-22 (1911).

and the K's principals, on which no finding of bad faith could be solely based — that anyone associated with the K's had "actual knowledge" of impropriety regarding any aspect of the lease transaction.

4. *Removal of the trustee.* There is no question that a court of equity has the power, at the behest of a beneficiary and in its sound discretion, to remove a trustee for proper cause. See G. L. c. 203, § 12; *Chase* v. *Pevear*, 383 Mass. 350, 370 (1981); *Hardiman* v. *Hardiman*, 11 Mass. App. Ct. 626, 629 (1981). The mere fact, however, that the trustee has been neglectful or has committed breaches of trust is not necessarily a ground for his removal, 2 Scott, Trusts §§ 107 & 109 (Fratcher 4th ed. 1987); *Chase* v. *Pevear*, 383 Mass. at 370; *Edinburg* v. *Cavers*, 22 Mass. App. Ct. at 223-224, at least if the trustee has not acted in bad faith. See *Perry* v. *Perry*, 339 Mass. 470, 478-479 (1959). Nor is "[t]he mere fact that there is . . . friction or hostility [between the trustee and the beneficiaries] . . . necessarily a sufficient ground for removal, since otherwise the beneficiaries could by quarreling with the trustee [always be able to] force him out." 2 Scott, Trusts § 107, at 109-111. See *Shirk* v. *Walker*, 298 Mass. 251, 258-260 (1937); *Weiss* v. *Weiss*, 354 Mass. 761 (1968); *Symmons* v. *O'Keefe*, 419 Mass. at 295-296; *Hardiman* v. *Hardiman*, 11 Mass. App. Ct. at 629. It is only "where there is such friction or hostility as seriously to impede the proper performance of the trust, especially if the trustee is at fault, [that] the trustee will be removed." 2 Scott, Trusts § 107, at 111. *Wilson* v. *Wilson*, 145 Mass. 490, 492 (1888). *Shirk* v. *Walker*, 298 Mass. at 260. *Gordon* v. *Gordon*, 332 Mass. 210, 212-213, cert. denied, 349 U.S. 947 (1955). *Chase* v. *Pevear*, 383 Mass. at 370. *Shear* v. *Gabovitch*, 43 Mass. App. Ct. at 688. The fundamental question on the issue of trustee removal, however, is not the wishes of the beneficiaries, but rather "whether the circumstances are such that the continuance of the trustee in office *would be detrimental to the trust,*" 2 Scott, Trusts § 107, at 104 (emphasis added) & § 107.3, at 124-125.

It may well be that, regardless of the alleged trustee misconduct complained of by Steele, had this been an ordinary trust conferring ordinary discretion on the trustee, Kelley might well be removable as trustee on the principles we recently discussed in *Shear* v. *Gabovitch*, 43 Mass. App. Ct. at 689, where the plaintiff-beneficiary was "not an income beneficiary,

entitled to periodic payments of the trust income, but instead receives distributions only in the trustees' discretion." We held there that, where there exists intense and ongoing hostility between the beneficiaries and the trustee, a trustee with "discretion over all distributions to a beneficiary cannot reasonably be expected to exercise his power with desirable perspective and detachment when his motives and integrity are constantly impugned by the beneficiary and the parties have been mired for years in a draining legal equivalent of total war. Prudence called for a change of trustees."[29] *Ibid.*

Such considerations may yet be deemed applicable even to a trustee with the expansive powers conferred by the CCT. Unfortunately, the jury were precluded from reaching a correct result on the issue of Kelley's removal by several additional errors on the judge's part. First, as we have previously noted, the mistaken submission of the c. 93A issue to the jury, with pointed admonitions to concentrate their attention on the issue of the unfairness of Kelley's dealings with the beneficiaries, necessarily infected the jury's conclusion as to the existence of "justification" for Kelley's removal,[30] particularly when the judge's instructions on Count VI specified that removal could be based on Kelley's having "acted against the best interests of the beneficiaries" and whether his removal was "essential to the interests of . . . the beneficiaries."

The instructions on the removal question were further deficient in not directing the jury to engage in a "careful consideration 'of all the circumstances,' " *Edinburg* v. *Cavers*,

---

[29]The trust provision in *Shear*, however, merely stated that "[t]he trustees may, from time to time, pay to or apply for the benefit of the then beneficiaries any part of the net income . . . or principal of the trust. . . ." *Shear* v. *Gabovitch*, 43 Mass. App. Ct. at 655 n.6. No such sweeping discretionary powers of the sort set forth in the CCT trust instrument were conferred in *Shear*. Further, "the mere fact that the trustee named by the settlor is one of the beneficiaries of the trust is not a sufficient ground for his removal . . . even though a large degree of discretion is by the terms of the trust conferred upon the trustee." Restatement (Second) of Trusts § 107 comment f (1959). In the absence of proof of an abuse of discretion, our courts have refused to remove the trustee named by the settlor in spite of the fact that he had an interest antagonistic to that of the beneficiary and might be tempted to favor himself unduly. See *Rogers* v. *Rogers*, 258 Mass. 228, 230-231 (1927); *Boston Safe Deposit & Trust Co.* v. *Taylor*, 262 Mass. 287, 289-290 (1928).

[30]The special question on Count VI (removal of the trustee) simply asked, "Do you find that the evidence you have heard in this case justifies the removal of Kelley as Trustee of [the CCT]?"

22 Mass. App. Ct. at 222 n.10, quoting from *Cooney* v. *Montana*, 347 Mass. 29, 38 (1964), which must be done on any petition for removal of a trustee. The most glaring omission of a relevant circumstance for the jury's evaluation was the judge's failure (over objection) to draw the jury's attention to the CCT trustee's unusually wide discretionary powers as they bore on the proper administration of the trust.

The judge's explicit invitation to the jury to deem the "absence of payment to beneficiaries" and the claimed inadequacy of Kelley's accounting to the beneficiaries (charged in Count I of the complaint) as sufficient causes for his removal, under the rubric of what was "essential to the interests of . . . the beneficiaries," insured a one-dimensional fact finding in which the jury would not consider "all the circumstances," most significantly the relationship between the exercise or non-exercise of the trustee's broad discretion (with respect to payments to and other dealings with beneficiaries) and the beneficiaries' rights in light of the genesis of and under the unique terms contained in this trust instrument. Cf. *Shear* v. *Gabovitch*, 43 Mass. App. Ct. at 674, 681 ("The judge's legal premise . . . that the trustees were obligated as matter of law to put the beneficiaries' interests above all other interests . . . was too narrow a view of the trustees' duty," particularly "in light of the fact that the [subject of the trust was, and was known by all from the trust's origin] . . . a family business . . . . Trust documents and the duties they impose on trustees must be read in the light of the circumstances known to the settlor at the time a trust is established. . . . Fiduciary duty did not require the trustees to accede to [a complaining beneficiary's] demand that they give the [beneficiaries] the final say on the sale [of trust property]. These were not nominee trusts, and as matter of law the judgment whether the sale was advantageous to the trust[ ] lay ultimately with the trustees, not with the beneficiaries or the settlor").

F. We have not addressed the defendants' other appellate arguments on appeal not mentioned above, either because it is unnecessary in light of the foregoing dispositions and analyses or because they are without substantive merit.

G. *Conclusion.* Paragraph VI of the final order of judgment dated April 18, 1996, is affirmed. The remainder of that judgment is vacated in its entirety, and the case is remanded to the

Superior Court for further proceedings consistent with this opinion.

*So ordered.*