Wexler, James H., J.
The plaintiffs, including administrators and executors of decedent shareholders as well as Trustees of trusts created by two of the decedent shareholders of Park Chandler Realty Trust (“PCRT j, brought this action against defendants seeking injunctive relief prohibiting and restraining Barry Krock (“Krock’j and William Roberts (“Roberts”),[3] both individually and as Trustees of PCRT, from diverting rents under the lease with Walgreen Eastern Co., Inc. (the “Walgreen lease”), entered into on January 14, 1994, from the PCRT to Superland Associates Limited Partnership (“Superland”), also a defendant, and prohibiting and restraining the diversion, wasting, alienation, mortgage, pledge, hypothecation, encumbering or transfer of any asset of PCRT. Plaintiffs seek to have the agreement for rent payments arising out of the Restrictive Covenant provision of the Walgreen lease declared illegal and void as a matter of law. Plaintiffs also seek repayment of any monies and rents unlawfully paid over by PCRT to Krock and Superland, totaling $1,158,628.00, which includes management fees, rent monies diverted to Superland, unpaid shareholder loans and bills, and interest on the loans. Finally, plaintiffs seek removal of Krock as Trustee of PCRT. Krock contends that according to the Declaration of Trust Establishing PCRT that the only plaintiff with standing is Manuel Sigel. Krock also contends that according to the authority given to Trustees under the Declaration of Trust, his actions were appropriate and legal. After a non-jury trial and based upon all the credible evidence and the reasonable inferences that I may draw from that evidence, the court makes the following findings of fact and rulings of law.

FINDINGS OF FACT AND RULINGS OF LAW

I. BACKGROUND

A. PARK CHANDLER REALTY TRUST

PCRT was created under declaration of trust on April 16, 1974. PCRT owns a two-lot parcel of realty located at the intersection of Park Avenue and Chandler Street in Worcester, MA. The original shareholders, the amount of their respective shares, and the years of death of deceased shareholders are as follows:
Original Shareholder Amount of Shares Year of Death
Hyman Burwick 50 Shares 1986
Tutter Burwick 50 Shares 1990
Saul Feingold 50 Shares 1987
Sydney B. Feingold 50 Shares 1980
Harry Friedberg 100 Shares 1990
Philip F. Goldberg 100 Shares 1989
Barry Krock 600 Shares
Louis Pemstein 100 Shares 1992
Manuel Sigel 100 Shares 2001
The following list indicates the relationships of the plaintiffs to the decedent shareholders:
Plaintiff Gerald Burwick is the Executor of the Estate of Hyman Burwick.
Plaintiff Alan Feingold, son of Saul Feingold and nephew of Sydney Feingold, is Co-Executor of the
*369 Estate of Saul Feingold, Co-Trustee of the Beatrice Feingold Terminal Trust, and Co-Administrator of the Estate of Sydney Feingold.
Plaintiff Howard Lurier is Co-Administrator of the Estate of Sydney Feingold.
Plaintiff Elsie Friedberg is Executor of the Estate of Harry Friedberg.
Plaintiff Ann Greenberg is Trustee of the Philip Goldberg Trust.
Plaintiff Bernard Pemstein is Executor of the Estate of Louis Pemstein.
Plaintiff Manuel Sigel died in 2001. His son Jerome Sigel is Trustee of a “Stock Power” Trust where Manuel Sigel transferred his shares of PCRT.
During the pendency of the 1986 action, on September 23, 1986, Krock, as Trustee for his children[4] and Philip Goldberg voted to remove the Trustees and appoint Krock and Roberts as Trustees.[5] The Declaration of Trust Article IX provides for removal and appointment of trustees:
In the event of death, resignation, incapacity or the ceasing to act as a trustee for any reason whatsoever, a successor may be appointed by vote of the holder or holders of a majority of the stock outstanding, or by a written instrument signed by the holder or holders of a majority of the stock outstanding . . . Whenever a vacancy in the office of Trustee occurs, the vacancy shall be filled by the registered holders of the outstanding shares. In fulfilling any vacancy, effect shall be given to the following:
The holder or holders cumulatively of fifty (50%) percent of the outstanding shares, shall at all times be entitled to designate, appoint and elect one-half of the Trustees, and the holder or holders cumulatively of the remaining fifty (50%) percent of the outstanding shares shall designate, appoint and elect one-half of the Trustees.
(Declaration of Trust, Article IX, April 16, 1974.) Of twelve-hundred (1200) total shares, Krock’s six-hundred (600) shares along with Goldberg’s one-hundred (100) shares[6] voted in favor of Krock and Roberts as Trustees. On June 7, 1989, summary judgment was entered in Worcester Superior Court Action 87-1875 declaring Krock and Roberts as the duly appointed Trustees of the PCRT.
B. SUPERLAND ASSOCIATES LIMITED PARTNERSHIP
The Superland Property is owned by Superland Associates Limited Partnership (“Superland”), f/k/a Copers Associates Limited Partnership. The partnership was formed on November 20, 1986. Janet E. Krock, wife of Barry Krock, is President of Superland, and the owners of Superland property are Barry Krock, members of his family, and Trusts of which Mr. Krock’s family members are beneficiaries. Superland owns a parcel of land on Park Avenue, abutting in part the parcel owned by PCRT.
C. PROCEDURAL POSTURE
Plaintiffs commenced this action on September 8, 1995. The defendants’ motion for partial summary judgment was heard by the court (Sikora, J.) and, on February 12, 1998, the court ordered entry of summary judgment of dismissal with prejudice of Count Two of the Plaintiffs’ Complaint and of any portions of Count One alleging a claim of self-dealing by the defendants as a result of the purchase of the Super-land property. The court stated that the doctrine of issue preclusion barred the attempted retrial of the issues previously articulated in the 1987 action that overlap with Count Two of the present action.
The issues remaining before the court from Count One are which, if any, plaintiffs have standing, whether the agreement between PCRT and Superland regarding the Walgreen lease’s declaration of restrictions is valid and appropriately valued, whether defendants breached their duties as Trustees of PCRT in administering shareholder loans and management fees, and finally, whether Krock should and can be removed as a Trustee for PCRT.

II. PLAINTIFFS’ STANDING

Close corporations and business trusts occasionally include provisions, like that in Article X §G of the Declaration of Trust for PCRT, which arrange for the purchase of shares of deceased shareholders upon their death in order to assure the surviving shareholders that the trust or corporation will continue to be closely held and in order to benefit the shareholder who dies by providing a market for the disposition of his shares. See Brigham v. M&J Corporation, 352 Mass. 674, 678 (1967). The provision in the PCRT Declaration of Trust states that:
Any executor, administrator, trustee in bankruptcy, assignee in insolvency, receiver, or any other person who shall become the holder of any such shares otherwise than by issue or sale by the Trustees or by transfer in accordance with the restrictions shall offer to sell them to the Trustees or their nominee in accordance with these restrictions . . .
The Trustees shall have the right to refuse to any person who shall acquire any shares otherwise than by issue or sale by the Trustees or by transfer in accordance with these restrictions the right to vote, receive dividends or enjoy any privilege of a shareholder.
(Declaration of Trust, Article X §G). There is, however, a waiver clause:
No shares of beneficial interest shall be sold or transferred on the books of the Trust until these provisions have been complied with, but the Trustees may in any particular instance waive the requirement.
*370 (Id.) In general, waiver may occur by an express and affirmative act, or may be inferred by a party’s conduct, where the conduct is “consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible.” KACT, Inc. v. Rubin, 62 Mass.App.Ct. 689, 695 (2004), citing Attorney Gen. v. Industrial Nat’l Bank, 380 Mass. 533, 536 n.4 (1980), quoting from Buffum v. Chase Nat’l Bank, 192 F.2d 58, 60-61 (7th Cir. 1951). The clause in the PCRT Declaration of Trust does not specify how a Trustee would waive the requirement, but read in light of the rest of the provision, conduct that indicates that Krock and Roberts were relinquishing their right as Trustees to purchase the shares clearly leads to a reasonable inference of waiver.
Defendants rely on Article X §G of the Declaration of Trust in their contention that at the time that the complaint was filed the only plaintiff with standing was Manuel Sigel. Plaintiffs assert that Krock’s actions indicate a waiver of the provision in question. Defendants contend that there was never a waiver because none of the current plaintiffs ever attempted to sell shares to the Trustees providing defendants with no opportunity to waive. Throughout Krock’s tenure as Trustee of PCRT, specifically during 1995 and 1996, PCRT’s accountants, at Krock’s instruction, forwarded the PCRT annual financial statements to the plaintiffs or their predecessors. Krock testified that he approved of the plaintiffs’ receipt of these financial statements because the plaintiffs or their predecessors were “entitled” to them as PCRT Shareholders. Furthermore, at no point during Krock’s tenure as Trustee did he request an offer of sale from any of the deceased shareholders’ predecessors nor did Krock refuse any of the predecessors any of the privileges of a shareholder.
The court finds that Krock waived the rights under this provision and relinquished his right as Trustee to purchase the shares. As such, the court finds that all of the plaintiffs have standing to bring this action. As a result, it is unnecessary to make specific findings as to the value of the original shareholder’s PCRT interest as of their date of death.

III. RESTRICTIVE COVENANT PAYMENTS

Trustees are responsible for the control and management of the trust, the extent of which should be set forth in the trust instrument. See Guerriero v. Commissioner of the Div. of Med. Assistance, 433 Mass. 628, 632 (2001), citing Restatement (Second) of Trusts §164 (1959). The standard measure of care, diligence, and skill required of a trustee in the management of a trust is that of “an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view.” 91 A.L.R.3d 904. However, “where a trustee has special or professional knowledge or skill, he ordinarily is under a duty to exercise such knowledge and skill, where applicable, in the administration of a trust.” Id. Fundamental to the role of trustee is the general rile that:
[N]o person holding trust funds can be allowed to derive any personal gain or advantage, either directly or indirectly, from the use [or sale] thereof... [That] he must account for all the profits arising from such use, if profits are made . . . [This rule] is also applicable to every mode in which such trustees may either directly or indirectly seek to derive a personal gain or advantage from the use of trust funds, whether by using the same in their personal business, or by treating the same as a loan to one or more or all of themselves ... or to a firm of which they are members or otherwise. Whatever form that transaction may assume, the salutary rule must be enforced which forbids them from reaping a personal profit from the method which they adopt of investing or managing the new trust estate.
O’Brien v. Dwight, 363 Mass. 256, 282 (1973), quoting Bowen v. Richardson, 133 Mass. 293, 296 (1882). The burden of proving good faith and fairness is on the trustee, as is the burden to show that any questioned transaction was advantageous to the beneficiaries. Johnson v. Witkowski, 30 Mass.App.Ct. 697 (1991). Remedies available as a result of a trustee’s breach of fiduciary duties include removal of the trustee, restoration of principal to the Trust estate, and restoration of any income or interest that the Trust estate lost as a result of the Trustee’s breach. See Symmons v. O’Keefe, 419 Mass. 288 (1995); see also Fine v. Cohen, 35 Mass.App.Ct. 610, 616-18 (1993).
In Johnson v. Witkowski, 30 Mass.App.Ct. 697 (1991), the Court reversed the trial court’s dismissal of a beneficiary’s complaint against trustees for breach of their fiduciary duties. Among other unauthorized and imprudent business decisions, the trustees/directors gave an unlimited guaranty to be used by its wholly-owned subsidiary in acquiring the assets of a financially insecure corporation in which the trustees /directors had a substantial interest. Id. This venture provided comparatively little benefit to the corporation. Id. The court found that the defendants did breach their fiduciary duties, and, citing Anderson v. Bean, 272 Mass. 432, 448 (1930), stated that “the rule that a fiduciary may not derive personal advantage at the expense of the trust, nor put himself in a position antagonistic to the beneficiaries of the trust, will be strictly enforced.” Johnson, 30 Mass.App.Ct. at 705.
Included in Article IV of the PCRT Declaration of Trust are the powers given to trustees. Generally, the declaration holds that:
Except as herein otherwise expressly provided, the Trustees, in general, shall have the power to deal with the Trust property as if they were absolute owners thereof free of all trusts and to take any other action that they may deem beneficial to the Trust.
*371 (Declaration of Trust, Article IV.) Among the powers expressly provided are:
[The] power to purchase or otherwise acquire such real property as they deem expedient; to sell or exchange any interest in real or personal property held by them for cash or for any other consideration, and upon such terms and conditions as they deem advisable; to borrow money and mortgage or pledge all or any part of the real or personal property or other assets of the Trust, and to issue bonds, notes or other evidences of indebtedness upon such terms and maturities as they think proper; to lend money without security, to execute as lessor or as lessee leases for any term including terms expiring after the termination of the Trust. . .
(Declaration of Trust, Article IV §B (emphasis added).)
On or about January 14, 1994, Krock and Roberts, as Trustees of PORT, entered into a lease agreement with Walgreen Eastern Co., Inc. (“Walgreen”). The term of the Walgreen lease commenced on January 14, 1994 and “shall continue for fifty (50) years and six (6) months following the Lease Commencement Date ...” (Walgreen Lease §2, Jan. 14, 1994.) The rental payments owed by Walgreen are as follows:
(i) A rent of $5,000.00 per month commencing on the Lease Commencement Date and continuing to and including the last day of the fifth (5th) full calendar month following the Lease Commencement Date; (ii) a rent of $11,666.66 per month commencing on the first day of the sixth (6th) full calendar month following the Lease Commencement Date and continuing to and including the last day of the tenth (10th) full calendar month following the Lease Commencement Date; (iii) a rent of $16,666.66 per month commencing on the eleventh (11th) full calendar month following the Lease Commencement Date and continuing to and including the last day of the one hundred twentieth (120th) full calendar month following the Lease Commencement Date; (iv) a rent of $18,333.33 per month commencing on the first day of the one hundred and tweniy-first (121st) full calendar month following the Lease Commencement Date and continuing to and including the last day of the two hundred fortieth (240th) full calendar month following the Lease Commencement Date; (v) a rent of $20,166.66 per month commencing on the first day of the two hundred forty-first (241st) full calendar month following the Lease Commencement Date and continuing to and including the last day of the three hundred sixtieth (360th) full calendar month following the Lease Commencement Date; (vi) a rent of $22,183.33 per month commencing on the first day of the three hundred sixty-first (361st) full calendar month following the Lease Commencement Date and continuing to and including the last day of the four hundred eightieth (480th) full calendar month following the Lease Commencement Date; (vii) a rent of $24,401.66 per month commencing on the first day of the four hundred eighlyfirst (481st) full calendar month following the Lease Commencement Date and continuing thereafter for the remainder of the Lease Term.
(Walgreen Lease §3.) The lease contains a Declaration of Restrictions which states in part that:
[N]o additional property which Landlord shall, directly or indirectly own or control and which is contiguous to the Leased Premises will be used for the operation of a drugstore or a so-called prescription pharmacy ... for the sale of so-called health and/or beauty aids and/or drug sundries ... for the operation of a business in which photofinishing services and/or photographic film and/or greeting cards and/or gift wrap are offered for sale ... for the operation of a business in which food items are sold for consumption off the premises . . . This article shall not apply to the operation of a grocery supermarket operated by a national or a regional grocery chain ... In addition, this Article as it applies to the sale of foods shall not apply to the operation of a restaurant.
(Walgreen Lease §12.) Accordingly, the Superland Property is subject to the Declaration of Restrictions because it abuts part of the parcel leased to Walgreen and because it is owned and controlled by Krock.
On January 27, 1994, an agreement to divide the rent under the Walgreen’s lease pursuant to the Declaration of Restrictions between PORT and Superland was executed by defendants, Krock and Roberts, as Trustees of PORT, and Janet E. Krock, as President of Superland. (Agreement, Jan. 27, 1994). The agreement provides that one-third of the rent payable by Walgreen to PORT is due to Superland for the period that the Declaration of Restriction remains in effect:
WHEREAS, the Trust and Superland recognize that the imposition of the restriction and recording of said Declaration of Restriction will impair the value of said real property of Superland.
NOW THEREFORE, the Trust and Superland hereby agree as follows:
1. Superland shall execute, acknowledge and deliver said Declaration of Restriction to Walgreen.
2. For the period that said Declaration of Restriction shall remain in effect the Trust shall pay to Super-land an amount equal to one-third (l/3rd) of the rent payable by Walgreen to the Trust pursuant to the Lease, commencing with the calendar month during which the rent shall first be payable by Walgreen to the Trust under Article 3(a) of the Lease. The payments due Superland hereunder shall be due and payable monthly, on the tenth (10th) day of each calendar month, and shall be payable whether or not Walgreen actually pays rent to its landlord under the Lease. It is understood and agreed that if rent shall be abated pursuant to the *372 Lease, the aforementioned payments due Super-land from the Trust shall likewise be abated and that when rent payable under the Lease shall increase, whether pursuant to the terms of the Lease, and amendment thereto or otherwise, the payments due Superland hereunder shall likewise increase.
3. The Trust hereby assigns to Superland the right to receive the payments provided for in Paragraph 2 hereof directly from Walgreen and agrees that each such payment made by Walgreen to Superland shall be credited against rent payable by Walgreen to the Trust under the Lease with the same force and effect as if such payment had been paid by Walgreen directly to the Trust. The payments due Superland from the Trust shall be due and payable to Superland notwithstanding any future assignment by the Trust of the right to receive rent to any person or entity, including but without limitation, the holder of any mortgage granted by the Trust upon premises of which the demised premises are a part.
4. The rights and obligations of the parties hereto shall be binding upon and enure to the benefit of their respective successors and assigns. The right of Superland and its successors and assigns to the payments provided for herein shall expire and be terminated only upon the expiration or termination of said Declaration of Restriction.
(Agreement §2.) From May of 1988 to April of 2005, one-third of the rent payments have been paid to Superland, totaling $707,250.00.
Plaintiffs contend that Krock failed to benefit PCRT and abused his discretion both in determining the value of the restrictive covenant and in agreeing to a lease of such a length. Plaintiffs support this contention with Martin Coleman’s (“Coleman”)[7] testimony that the Superland property does not warrant the value of one-third (1/3) of the rent paid by Walgreen. Coleman suggested that the likelihood of direct competition at the abutting property should inform the negotiations of a restrictive covenant. Coleman stated that Krock should have analyzed the covenant amount based on the fair rental value of the Superland property as the burdened property, rather than basing the amount on the rent being paid by Walgreen for the PCRT property. Coleman further stated that the Superland property is not situated in a prime location and also is in a flood area, making the property much less valuable and much less likely to attract the type of establishment that would violate the restrictive covenant. He also stated that restrictive covenant agreements typically involve payments to the burdened property for two years, not for the duration of a lease. As such, Coleman testified that the agreement negotiated by Krock was excessive, not commercially reasonable, and not equitable.[8] Moreover, Plaintiffs claim that Krock is not competent to determine the value of the restrictive covenant, and they point out that he had never negotiated a restrictive covenant prior to that found in the Walgreen lease.
Krock testified that he based the valuation on his “gut feeling" and that the valuation was made in good faith and involved no willful wrongdoing. However, Krock’s testimony to the valuation was completely void of substance. Krock relied on absolutely no empirical data and consulted no one, nor did he provide any rational or factual basis for his approach.
Krock asserts that Article VI of the Declaration of Trust allows the Trustees this level of power and discretion:
Any Trustee, shareholder, officer, or agent of the Trust . . . may sell to, buy from, contract with and otherwise deal with this Trust as freely and effectually as though no interest or fiduciary relation existed; and the Trustees hereunder shall have power to exercise or concur in exercising all powers and discretions given to them hereunder or by law, notwithstanding that they or any of them may have a direct or indirect interest, personally or otherwise, in the mode, result or effect of exercising such powers or discretions.
(Declaration of Trust, Article VI section C (emphasis added).)
In Steele v. Kelley, the court stated that the appropriate consideration in determining whether, given broad discretionary powers, a trustee breached his fiduciary duty is: whether the trustee was “so arbitrary, capricious, dishonest, or fraudulent as to amount to an abuse of discretion that should be prevented or corrected by a court of equity?” 46 Mass.App.Ct. 712, 736 (1999). Defendants fail to demonstrate that the valuation and length of the restriction was determined in good faith. Krock’s attitude at trial was simply that he could do whatever he wanted without any justification. In Johnson, the court reaffirmed that a fiduciary may not derive personal advantage at the expense of the trust and stated that the burden was on the trustee to demonstrate good faith and to demonstrate that any questioned transactions were advantageous to the trust. 30 Mass.App.Ct. 697 (1991). The court considered the actions of the trustees in Johnson “imprudent” and the court’s decision was based in part on the failure of the trustees to demonstrate that their actions resulted in any benefit to the trust. Id. Likewise, this court is convinced that Krock’s determination was not a reasonable assessment of the value of such a restriction on the Super-land property. The court finds that Krock’s actions were completely arbitrary.
Plaintiffs have demonstrated that the lease provision in question was unreasonable and excessive in amount and duration. Coleman’s testimony offering what he considers an appropriate valuation and length of the restriction was speculative. However, in light of the standard of a preponderance of the evidence, the *373 court is satisfied that the value, length and terms proffered by Coleman are more reasonable.
Therefore, as of the date of this opinion, the lease provision in question is declared null and void. However, monies that have been paid by Walgreen to Superland will not be awarded as damages to plaintiffs because the court finds Coleman’s assessment too speculative for that purpose.
Plaintiffs also seek from Superland the proportionate share of fees that PCRT paid to Lane & Altman[9] and Mark Management[10] for the negotiation, preparation, and execution of the Walgreen lease. Specifically, plaintiffs seek $727.00, representing Superland’s share of the fees. The court finds this amount to be a reasonable and appropriate reimbursement of services that benefited both PCRT and Superland.

IV. ORIGINAL SHAREHOLDER LOANS AND OTHER FINANCIAL ISSUES

Between 1980 and 1985, loans were made to PCRT by various individuals and entities, totaling approximately $125,000.00.[11] The loans continued to accrue interest on PCRT’s books until approximately the fiscal year ending 1992, when, according to Frock, interest stopped accruing because PCRT did not have funds to pay the interest.[12] The PCRT financial statements for that year indicated that “interest will be resumed when the ability to pay was present.” Accordingly, the accrual of interest on the loans should have resumed in 1995.
During the fiscal year ending in 1998, Frock directed PCRT’s accountants to recharacterize the Original Shareholder Loans as “additional paid-in capital” and the associated interest as “other income.” Frock contends that these conversions were made at the recommendation of PCRT’s accountant, Marvin Lainer; however, Lainer testified that, notwithstanding any and all accounting advice that Frock received from Lainer, that Frock made all the financial decisions. These conversions had the effect of wiping the loans, as well as the associated interest, off the records and of eliminating PCRTs obligation to repay such loans or any interest. However, Frock stated at trial that he did make sure that his family’s loans were repaid. At the time that the loans were re-characterized, PCRT had sufficient cash to at least partially pay off all of the loans.
Plaintiffs assert that Frock abused his discretion as Trustee and committed self-dealing in the inappropriate management of PCRT finances. Plaintiffs offer as evidence of this mismanagement the manner in which the shareholder loans were administered. Mr. Jon Fudeman (“Fudeman”)[13] testified that proper management would have saved PCRT $263,420.00 for the period from 1988 through 2005.
Frock claims that the accounting methods benefited the equity position of PCRT shareholders[14] and that according to the declaration of Trust, he acted within his authority. The declaration of Trust states in pertinent part that;
[The Trustee] shall have the power ... to borrow money and mortgage or pledge all or any part of the real or personal property or other assets of the Trust, and to issue bonds, notes or other evidences of indebtedness upon such terms and maturities as they think proper . . .
(Declaration of Trust Article IV §B.) In or about 1997, PCRT’s accountants recommended that Frock keep the expenses to a minimum. Despite this recommendation, during the same fiscal year, Frock took a management fee for himself of $170,000.00,[15] causing the Trust to sustain additional losses.
The court finds that Frock abused his discretion in management of the shareholder loans. Frock paid off his own loan and his family’s loans while causing the other shareholder loans to no longer accrue interest and failed to repay these loans even after there were funds available to do so. His management of the treatment of the loans was arbitrary. These actions demonstrate to the court that Frock addressed his personal interests to the detriment of the Trust thereby breaching his fiduciary duty. The court finds that lost interest in the amount of $263,420.00 should be restored to PCRT.

V. MANAGEMENT FEES

Massachusetts General Law ch. 206 §16 states that:
An executor, administrator, guardian, conservator or trustee shall be allowed his reasonable expenses, costs and counsel fees incurred in the execution of his trust, and shall have such compensation for services as the court may allow. Such compensation, expenses, costs and counsel fees may be apportioned between principal and income as the court may determine.
Mass.Ann. Laws ch. 206, §16 (2006). In Massachusetts, there is no rule of law that trustees are to receive a commission of a certain percent on all income received and paid out. Rather the only rule of law is that a trustee receives a just and reasonable compensation for all services performed in the administration of the trust. See Corcoran v. Thomas, 6 Mass.App.Ct. 190 (1978), citing Parker v. Hill, 185 Mass. 14, 15 (1904). Regarding percentage measures of compensation employed by commercial trust companies, the court has stated that these are grounded in contract and that “in the absence of agreement with the ... beneficiaries [such measures] may not be employed by other fiduciaries.” Shear v. Gabovitch 43 Mass.App.Ct. 650, 687 (1997), citing Grimes v. Perkins Sch. for the Blind, 22 Mass.App.Ct. 430, 443-44 (1986).
The PCRT Declaration of Trust does not specify an amount or percentage to be paid as compensation to the Trustee. Rather, the declaration provides that:
*374 The compensation of Trustees shall be fixed by the majority vote of the shareholders and may be changed by a majority vote thereof from time to time. The Trustees shall have no authority in case the compensation is fixed by such shareholders to alter such compensation.
(Declaration of Trust, Article VIII.)[16] Krock testified that there was never a vote of the shareholders approving his fees for his Trustee services. However, because Krock holds fifty-percent (50%) of the shares, the other shareholders would be unable to alter the rate of compensation according to the method proscribed in the instrument, a majority vote.
Between the fiscal year ending 1998 through the fiscal year ending 2005, Krock paid himself management fees from PCRT totaling $342,000.00.[17] Krock asserted that his management fees have been reasonable and appropriate given his experience in real estate management and the work that he has performed on behalf of the trust. Krock bills at a rate of $600.00 per hour and $5,000.00 per day for his services, however, there is absolutely no rational basis for these rates. Krock kept no records of his services and there are no invoices. In connection with his role as PCRT Trustee, Krock maintains no staff nor maintains any software system or information data tracking software. All accounting, bookkeeping, and bill paying functions are handled by PCRTs accountants or bookkeepers. Krock’s testimony of what he did in his role as trustee is completely void of substance. His description of efforts to market the property was completely void of substance. His description of the role he played in court proceedings was also void of any substance.
Plaintiffs claim that the management fees that Krock paid himself were excessive in light of the actual work he performed. Coleman testified that a management fee of 3.5% of gross rents would be the highest appropriate management fee, but that such a fee usually includes the performance of functions including: cleaning the property, landscaping, snow removal, supervision of outside services, obtaining bids from contractors, leasing of vacant space, collection of unpaid rent, maintaining a staff, managing rental agreements, and performing the actual bookkeeping functions for the property owner. Krock performed none of these functions. Accordingly, Coleman opined, and Fudeman agreed, that a management fee of 2.5% of the gross rents would be “generous” and all that could be justified for Krock’s management. Compared with the actual $342,000.00 paid to Krock as management fees, according to Coleman’s testimony, reasonable management fees payable by PCRT to Krock for service during the years 1988 through 2005 would total $81,479.00.
Krock has failed to provide any rational basis for the amount of $342,000.00 much less for a rate of $5,000 per day. Where there is evidence[18] that Krock performed some function in his tenure as Trustee of PCRT, the court finds that some compensation is appropriate. The court finds that the amount suggested by Coleman of $81,479.00 would be reasonable for the services performed, if Krock had performed all of his services reasonably. He did not do so. Krock is ordered to pay $282,000.00, which is the difference between the $342,000.00 paid to him and the amount of $60,000.00 which the court finds to be reasonable compensation for his services.
VI. TRUSTEE REMOVAL
Pursuant to Massachusetts General Law ch. 203, §12:
The supreme judicial court, the superior court or the probate court may, upon petition of a party beneficially interested in a trust under a written instrument, and after notice to the trustee and all persons interested, remove the trustee if it finds that such removal is for the interests of the beneficiaries of the trust . . . [i]f the petition for removal contains a prayer therefore, the court may, upon such notice as it considers reasonable, appoint a successor to fill the vacancy caused by such removal, without the filing of a separate petition for that purpose.
Mass.Ann. Laws ch. 203, §12 (2006). Trustees have been removed for hostiliiy toward the trust beneficiaries where said hostility does not result from the acts or conduct of the beneficiaries. Cooney v. Montana, 347 Mass. 29, 38 (1964). Courts may also exercise the power of removal “because of a risk of serious harm to the beneficiaries, possible conflict of interest, improper disregard of the interests of the beneficiaries or of the corporation, serious breaches of trust, and comparable circumstances.” Massa v. Stone, 346 Mass. 67, 75 (1963). The fundamental question on the issue of trustee removal, however, is not the wishes of the beneficiaries or shareholders, but rather “whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust.” Steele v. Kelley, 46 Mass.App.Ct. 712, 742 (1999), quoting 2 Scott, Trusts § 107, at 104 & § 107.3, at 124-25.
The Declaration of Trust sets forth the provision for removal and appointment of successor trustees in Article IX:
Any Trustee may be removed by vote of the holder or holders of a majority of the stock outstanding.
In the event of the death, resignation, incapacity or the ceasing to act as a trustee for any reason whatsoever, a successor may be appointed by vote of the holder or holders of a majority of the stock outstanding, or by a written instrument signed by the holder or holders of a majority of the stock outstanding. The number of Trustees may be increased by a vote of the holder or holders of a majority of the shares outstanding or by a written *375 instrument signed by the holder or holders of a majority of the stock outstanding.
Whenever a vacancy in the office of Trustee occurs, the vacancy shall be filled by the registered holders of the outstanding shares. In fulfilling any vacancy, effect shall be given to the following:
The holder or holders cumulatively of fifty (50%) percent of the outstanding shares, shall at all times be entitled to designate, appoint and elect one-half of the Trustees, and the holder or holders cumulatively of the remaining fifty (50%) percent of the outstanding shares shall designate, appoint and elect one-half of the Trustees.
Upon election of a new Trustee, an instrument in writing naming the new Trustee, signed and acknowledged by a majority of the Trustees, shall be recorded at the Registry of Deeds in which this instrument is recorded.
(Declaration of Trust Article IX.) Plaintiffs seek the court’s intervention because Krock holds fifty percent of the shares, making it the case that the provisions in Article IX afford the plaintiffs no instrument for removing Krock as Trustee or for appointing a new Trustee. Plaintiffs assert that Krock should be removed because of breach of his fiduciary duties and abuse of his discretion as Trustee.[19] Plaintiffs also seek the court’s intervention in striking Article IX (quoted above in its entirety) of the Declaration of Trust and substituting the Article with the following:
Within fourteen (14) days of the resignation, death, removal, termination, replacement or any other change of the Trustee, the Plaintiffs to a certain Worcester Superior Court Civil Action entitled Manuel Sigel et al v. Barry Krock et al, Docket Number 95-01935-D, their agents, servants, employees, representatives, heirs, beneficiaries, legatees or assigns will be exclusively authorized to vote in accord with their percentage ownership interest to name any co-Trustee, successor, or replacement Trustees of the Trust. It is expressly determined that neither Barry Krock, individually, nor as former Trustee of the Park Chandler Realty Trust nor William Roberts or any others who possess title, or control his original 600 shares of stock in the Trust, or any of either Mr. Krock’s or Mr. Robert’s agents, servants, employees, heirs, representatives, legatees, lineal descendants, their fiduciaries, or assigns will have any authority to cast any vote for the appointment of any co-Trustee or successor or replacement Trustees of the Trust.
If for any reason the parties authorized under this section to cast votes for the appointment of any co-Trustee, successor, or replacement Trustees are deadlocked or unable to otherwise agree on the lawful vote and appointment of such co-Trustee, successor, or replacement Trustee, the parties shall make a formal resolution or record of such inability to appoint said Trustees in the formal Minutes of the Park Chandler Realty Trust minute book, and will thereafter submit the issue of the appointment of such co-Trustee, successor or replacement Trustees to the American Arbitration Association for resolution within 60 days of such formal notation in the Trust’s corporate minutes. The parties will equally share all costs and expenses and fees associated with such arbitration.
Krock claims that he has managed the affairs of PCRT appropriately and as such there is no need or basis for his removal.
Krock’s conduct involving the Original Shareholder Loans, the outstanding accounting bill, and the negotiation of the Walgreen lease demonstrate that he failed to administer the Trust’s finances properly. In light of the court’s finding that Krock breached his fiduciary duties and given the extreme amount of money that PCRT lost as a result of his breach, the court finds removal of Krock as Trustee appropriate. Furthermore, the court strikes Article IX of the Declaration of Trust and instructs that the plaintiffs’ proposed substitution be incorporated into the Declaration of Trust. This substitution provides an equitable means through which a successor trustee will be appointed and by whom. The Declaration of Trust is ordered reformed and successor trustees will be appointed accordingly.

VII. ATTORNEYS FEES

An award of attorneys fees for either party is generally based on a number of factors and is always a highly discretionary matter left to the court. See Lattuca v. Robsham, 442 Mass. 205 (2004); see also Shear v. Gabovitch, 43 Mass.App.Ct. 650 (1997). However, a trustee should not receive payment of his attorneys fees and expenses in connection with litigation relating to trust business if the trustee’s attorneys fees and expenses would not have been incurred or would not have been necessary but for the trustee’s actions. See National Academy of Sciences v. Cambridge Trust Company, 3 Mass.App.Ct. 314 (1975). Furthermore, if the court finds that the trustee was at fault for litigation expenses that were incurred, the court may deny the payment of attorneys fees from trust funds. Id.
The Declaration of Trust states in pertinent part that:
No Trustee shall be personally liable for any obligation or liability incurred by this Trust or by the Trustees, and each Trustee shall be entitled to reimbursement and exoneration out of the Trust estate according to law . . . The Trust estate alone shall be liable for the payment or satisfaction of all obligations and liabilities incurred in carrying on the affairs of the Trust.
(Declaration of Trust Article VII §§C, D.) Although the Declaration of Trust provides general protection from liability for Trustees, the law protects the Trust from depletion as a result of bad faith or fault on the part of the Trustee. As such, the court finds that the litigation expenses would not have been necessary but for the defendant’s actions, and therefore, the payment of defendant’s attorneys fees from trust funds is denied.
*376 Plaintiffs have requested their attorney, expert witness and other fees. However, they fail to set forth any legal authority for the award of these fees. As such, the court denies the request.

ORDER

For the reasons stated above, plaintiffs’ Count I for injunction against defendants is GRANTED. From this date forward the restrictive covenant provision of the Walgreen lease is declared invalid and void. The Declaration of Trust is ordered reformed and successor trustees will be appointed accordingly. Defendants are hereby ORDERED to pay the following damages:
The amount of $727.00, representing the proportionate share of fees paid to Lane & Altman and Mark Management for the negotiation, preparation, and execution of the Walgreen lease.
The total amount of management fees to be restored to PCRT by defendants is $282,000.00.
The total amount of interest to be restored to PCRT by defendants is $263,420.00.
The total amount of damages to be paid to PCRT by defendants is $546,147.00.

Williams Roberts died in October 1996.

Krock had his shares held for the benefit of Aaron Krock (300 shares) and Kathryn E. Krock (300 shares).

Both had previously served as Trustees of PCRT from 1977 to 1981.

On December 13, 1988, Philip Goldberg signed an Irrevocable Proxy under which he appointed Krock power and proxy authority to vote with respect to his one-hundred (100) PCRT shares.

Martin J. Coleman is a real estate appraiser, consultant and licensed broker in the Commonwealth of Massachusetts. He has been actively engaged in the valuation of commercial, industrial and residential properties since 1946. He has been qualified to testify as an expert in the field of real estate appraising.

Coleman suggested that a reasonable value would be a fraction of two years of the fair rental value of the Superland parcel, $73,000.00 as opposed to the $707,250.00 that was paid from May 1988 to April 2005.

The total amount paid to Lane & Altman by PCRT for their services concerning the Walgreen lease was $11,220.00.

The total amount paid to Mark Management by PCRT for their services concerning the Walgreen lease was $88,000.00.

The “Original Shareholder Loans" were made in the following amounts by the following individuals or entities:
1)Barry Krock $65,000.00
2) Manuel Sigel $9,166.66
3) Estate of Sydney Feingold $15,000.00
4) Saul Feingold $9,166.66
5) Harry Friedberg $9,166.66
6) Carl Burwick & Company $9,166.66
7) Louis Pemstein $9,166.66

Until 1992, accmed interest on these loans was recorded in the amount of approximately $140,000.00.

Mr. Jon Fudeman has been a licensed Certified Public Accountant practicing in the Commonwealth of Massachusetts since 1973. He is a certified valuation analyst and member of many professional designations.

Krock asserts that the net effect of these conversions was to improve PCRT’s retained deficit from ($679,494.00) to ($516,692.00) and to improve PCRTs equity position from ($655,494.00) to ($366,789.00).

Krock testified that this sum was based on ten to twelve years of service; however, he could not remember the exact number of years, nor the services provided.

The declaration also indicates what funds the compensation should be taken from:
[Trustees] shall also have the following powers:
A. To collect and receive income therefrom, and the proceeds, if any upon the sale or disposition of the property or securities or any part thereof, or from any other source; and to pay out of the said income, principal or proceeds the following:
4. To pay themselves reasonable compensation for their services thereunder.
(Declaration of Trust, Article IV §A4.)

There were no records produced for the fiscal year ending 2002, thus, this year is unaccounted for.

The leasing of the PCRT property to Walgreen and negotiation with other organizations are evidence of Krock’s service in his role as Trustee.

In addition to the mismanagement of Original Shareholder loans and the excessive restrictive covenant lease provision, plaintiffs highlight an outstanding bill for accounting services which remained on the PCRT books for 11 years. The bill in question was for services performed by the accounting firm of Saul and Alan Feingold prior to Marvin Lainer’s (“Lainer”), accountant to Krock as trustee of PCRT, assuming accounting responsibilities in 1987. When the accounting records and books were transferred to Lainer’s firm, there was an outstanding bill for services from the Feingold’s accounting firm in the amount of $10,360.00. During the 11 years between 1987 and 1998, Alan Feingold had several conversations with Lainer concerning the outstanding invoice. Lainer assured Alan Feingold that when Lainer’s bills were paid, the outstanding Feingold bill would be paid as well. During the fiscal year ending in 1997, Lainer’s bills in the approximate amount of $26,000.00 were paid leaving a zero balance. Alan Feingold’s bill remained unpaid and on the books. During the fiscal years ending 1996, 1997 and 1998, the Feingold accounting bill was written off as a bad debt; however, the Krock family loans were repaid with interest at twelve percent. Krock stated that Feingold might not have provided sufficient backup for the bill. However, Lainer testified that Krock never gave Lainer a reason that he was writing off the bill. In each of these years, PCRT had positive ending cash balances, which would have allowed other shareholder loans and outstanding balances to be paid off at least in part.